## Pyzdrowski et ux., Appellants, v. Pittsburgh Board of Adjustment.

Argued October 3, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Gilbert E. Morcroft,* for appellants.

*Cyril A. Fox, Jr.,* Assistant City Solicitor, with him *Marion K. Finkelhor,* City Solicitor, for appellee.

*Leonard M. Mendelson,* for intervenors.

OPINION BY MR. JUSTICE POMEROY, March 25, 1970:

This appeal was brought from an order of the Court of Common Pleas of Allegheny County which affirmed the decision of the Board of Adjustment of the City of Pittsburgh granting Mario DePasquale a variance from the side yard requirements of the zoning ordinance applicable to his property, and finding that the present use of the building on the property constitutes a nonconforming structure. Appellants, neighboring property owners who intervened below, contend that the court committed error of law and abuse of discretion in affirming that decision.

The background facts are these: Some time previous to 1919 a single-family dwelling was erected on a lot fronting 100 feet on Wallingford Street in the City of Pittsburgh. In 1919 the house was remodeled, pursuant to a building permit, to accommodate two families. As remodeled it had, and still has, 3 stories and 22 rooms, and is 2.38 feet from the westerly lot line. There was evidence tending to show that since 1922 the house has been occupied by two or more families.

In 1923 there was adopted Pittsburgh's first zoning ordinance, and the property was zoned "B" Residential, allowing two-family occupancy. Under a 1926 amendment the property was rezoned "C" Residential, to permit only single-family occupancy. This use restriction has continued to the present time. In 1958 the present City zoning ordinance was adopted. This requires two side yards of 10 feet each for side yards not abutting streets. It also provides that one parking stall shall accompany each dwelling unit.

Mr. DePasquale purchased the property in 1962, and the following year subdivided it into two 50-foot lots, apparently pursuant to a properly filed subdivision plan. The dimensions of the dwelling house are such that on its easterly side the side yard area after this subdivision is only 9.3 feet wide, as contrasted with 59.3 feet before the subdivision.[1]

In May, 1962, Mr. DePasquale applied for an "Occupancy Permit" of the existing structure. The application states that it is desired to change an existing 3 family dwelling to a 2 family dwelling. It indicates that this would be a continuation of a nonconforming use. The application further stated that to be approved, a variance was required as to the side yard widths to the extent they were under the 10 foot requirement.[2]

From a refusal of this application by the Zoning Administrator, DePasquale appealed to the Board of Adjustment. Hearings were held in 1967 and 1968.[3] The Board granted the application, deciding that the

---

[1] The width of the yard actually varies from 9.3 to 9.6 feet.

[2] There appears to be no disagreement among the parties that the 2.38 foot westerly side yard, having been in existence since before any zoning ordinance, is legal and requires no variance.

[3] The 1968 hearing was on a remand from the then County Court of Allegheny County following an appeal by the present appellants from the grant of a variance by the Board.

use of the DePasquale structure as a two-family dwelling was a nonconforming use in a nonconforming structure. It further granted a variance of the 7/10 of one foot deviation from the side yard width requirement on the ground of undue hardship, with no detriment to the adjacent properties or the character of the neighborhood by the allowance of the variance. The Board's decision was upheld by the court below.

Initially we are presented with a question of the proper scope of our review. The question arises because of an uncertainty whether the lower court did or did not take additional evidence. If it did not take evidence, that court's function is only to review the action of the Board on the record made before that body in order to determine whether the Board committed a manifest abuse of discretion or error of law. On appeal to this Court, our scope of review is the same. *National Land and Investment Co. v. Easttown Township Board of Adjustment*, 419 Pa. 504, 523, 215 A. 2d 597 (1965); *Cleaver v. Board of Adjustment*, 414 Pa. 367, 380, 200 A. 2d 408 (1964); *Stratford Arms, Inc. v. Zoning Board of Adjustment*, 429 Pa. 132, 135-36, 239 A. 2d 325 (1968). On the other hand, if the Court of Common Pleas received additional testimony or other evidence, it then had a duty to decide the issue presented on its merits. This is founded on a recognition that additional facts brought out before the court could require a result different than that reached by the Board on the different record before it. When this occurs, this Court's role is to review the lower court's decision, as distinguished from the Board's. *Rogalski v. Upper Chichester Twp.*, 406 Pa. 550, 178 A. 2d 712 (1962).

At the hearing before the lower court, the judge received as a new exhibit offered by appellants a letter dated May 23, 1968, from the City Zoning Administrator to the Chairman of the Board of Adjustment con-

cerning the property in question. Appellants contend that the court then went on to decide the case *de novo,* and hence that we should review the court's action rather than that of the Board. The court, however, specifically reserved ruling on the admissibility of the letter. In its opinion it noted that the letter raised collateral issues,[4] concluded that these were not proper for its consideration at that stage of the proceedings, and so limited itself to a review of the record before the Board and the propriety of its action thereon. It concluded that the Board had committed no abuse of discretion or error of law. We therefore conclude that the *Rogalski* rule is not applicable, and our review is likewise that of reviewing the Board's determination for error of law or abuse of discretion.

We turn now to the merits. As provided by the Pittsburgh zoning ordinance, Mr. DePasquale, the owner, undertook to obtain an occupancy permit to evidence his right to the use of the property in question for two families. In connection with his application to do so, and in aid of it, he requested a variance as to the side yard width requirement. The first question, therefore, is whether he established nonconformity in the technical zoning sense. Declaratory of the law, Section 202 of the 1958 Pittsburgh zoning ordinance defines nonconforming use thus: "A use of a structure or land other than a sign, lawfully existing on the effective date of this Ordinance or subsequent amendment hereto, which does not completely conform to the use regulations applicable in the district in which it is located." In the same section, the ordinance defines

---

[4] The letter indicated that the easterly side yard width deficiency of 7/10 foot had been brought about by the earlier DePasquale subdivision. The record shows that this point had actually been made otherwise before the Board. Thus the issue of voluntary creation of the hardship complained of was in fact in the record which the Board had before it.

nonconforming structure: "A structure or a portion thereof, other than a sign, lawfully existing on the effective date of this Ordinance or subsequent amendment hereto, which was erected or altered for a use that does not completely conform to the use regulations applicable in the district in which it is located." Section 2703-2-b of the ordinance provides that a nonconforming use may be continued in a nonconforming structure. Under these definitions the questions before the Board were whether the structure as altered to accommodate two families and the use of it by two families were lawful prior to the adoption of the 1958 ordinance.

Since the property here in question had been initially zoned for single-family dwellings by the 1926 amendment to the original 1923 Pittsburgh zoning ordinance, the lawful existence of the structure as altered for the nonconforming use and the lawfulness of the use itself depended upon their existence prior to 1923.[5]

The evidence to this effect, commencing with the 1919 remodeling mentioned above, was substantial. The record contains the separate listings of occupants of the house under two separate addresses corresponding to the two entrances of this house which appeared in the Pittsburgh Directory as early as 1922. It appears that a family named Steinmeyer, who were the 1919 owners, continued to live in one of the apartments in

---

[5] Although the record is unclear as to the exact reason the Board chose 1923 as the crucial year rather than 1926 when two-family dwellings were first prohibited, it appears that even the permitted two-family dwellings in 1923 were required to have wider side yards than the 2.38 foot side yard to the west of the DePasquale house. Thus, the Board proceeded on the theory that to be completely lawful as a nonconforming structure, this house, in its present configuration and location, must have existed prior to 1923. The evidence indicates that this was the fact.

this house from at least 1922 to 1946, while their daughter and her husband, a Mr. and Mrs. Coyle, lived in the other.[6]  That there were indeed separate dwelling units is indicated not only by the fact that they had separate exterior entrances but also by the fact that after Mrs. Steinmeyer's death, the apartment which had previously been occupied by her was leased to two successive tenants and their families.  Between 1949, when the property was sold by the Steinmeyer's daughter, Mrs. Coyle, and 1962, when Mr. DePasquale purchased it, the two intervening owners divided it into as many as five dwelling units.

Upon this evidence the Board was fully justified in its findings as to use and occupancy and in its conclusion that the use of this house as a two-family dwelling constituted a lawful nonconforming use in a nonconforming structure as those terms are defined by the zoning ordinance.

The next question is whether the Board erred in allowing the 7/10 foot side yard variance.  Recently, in the case of *O'Neill v. Zoning Board of Adjustment,* 434 Pa. 331, 334-35, 254 A. 2d 12 (1969), we restated the principles governing the disposition of variance cases, referring to numerous past decisions.  As relevant here, those principles are: (1) in order to obtain a variance, the petitioner must prove (a) that the variance will not be contrary to the public interest and (b) that un-

---

[6] Appellants argue that the close family relationship between the occupants of the two apartments in this house requires the conclusion that it was only a single family dwelling.  Section 202 of the 1958 zoning ordinance defines "Family" as "either an individual, or two (2) or more persons related by blood or marriage or adoption, . . . living as a household in a dwelling unit."  The error in appellant's argument is that, under the definition given, to be a single-family the persons need not only be related but must also be living as a single household in a single dwelling unit.  Here the Steinmeyers and the Coyles lived as two households in two dwelling units.

necessary hardship will result if the variance is not granted; (2) a variance will not be granted solely because the petitioner will suffer an economic hardship if he does not receive one; and (3) a variance is especially not to be granted when the petitioner purchased the property with the knowledge of the existing zoning regulations, or when he should have been aware of the zoning regulations.

Applying those principles to the facts of this case, we have no doubt that all but the last are satisfied. The circumstances here are exceptional: Mr. DePasquale would be prevented from making not a more remunerative use of this structure, but from making any use of it without the variance. Because the 2.38 foot westerly side yard has existed since at least 1919 and so predates any zoning yard requirements, it is not here in question; but, at the same time, its existence would prevent Mr. DePasquale from undertaking even the onerous task of moving this structure to the west 7/10 foot to comply with the 10 foot requirement on the east side. The only other possibility would be for De-Pasquale to remove 7/10 of a foot from the east side of this structure. This is a practical impossibility and to impose such a requirement on him would indeed be to cause him an unnecessary hardship; yet because of the insignificance of the deviation (8.4 inches, or 7/10′ of the required 10 foot width), no concomitant benefit would be conferred upon the public. Had Mr. DePasquale played no part in creating this situation, we would affirm the Board's action without hesitation. Because, however, he did create this situation by his action in subdividing the property, we must consider it in light of other decisions concerning self-created hardships.

The situation here is readily distinguishable from those considered in almost all of the decisions cited to us by appellants because it involves a variance from lot size requirements rather than a use variance. While

both types of variances are controlled by the same principles, the effect upon the public interest of a use variance usually is greater than the effect of a variance necessitated by only a minor deviation from a lot restriction. Of the self-created hardship cases cited to us involving lot variances, *Lovering v. Zoning Board of Adjustment,* 406 Pa. 339, 178 A. 2d 740 (1962), involved only the propriety of granting such a variance where no evidence of undue hardship was presented. *Phillips v. Griffiths,* 366 Pa. 468, 77 A. 2d 375 (1951), presented a flagrant and deliberate disregard, after explicit warning, of the set back requirements for residence properties, and the remodeling of a coach house without seeking any zoning permission. *Stratford Arms, Inc. v. Zoning Board of Adjustment, supra,* likewise involved, as the Board found, a construction of apartment buildings "in total and willful disregard of the provision of the zoning ordinance", and the filing of false plans in order to secure a building permit. *Riccardi v. Plymouth Twp. Board of Adj.,* 393 Pa. 337, 142 A. 2d 289 (1958), involved a structure proposed to be built rather than an existing one, and involved significant encroachments upon required open spaces. The hardship to the property owner in each of those cases was thus not of the same dimension as in the case at bar, and the effect of the deviations upon the public interest was far greater.

*Crawford Zoning Case,* 358 Pa. 636, 57 A. 2d 862 (1948), on the other hand, presents a situation closely analogous to the instant one. There, the property owner sought a building permit to convert a garage situated on his property into a single family dwelling after he had subdivided the property and sold the other part, together with the house on it. Although the garage, as located on the remaining portion of the property, violated (by 2.2 feet and 16.5 feet, respectively) both the side and rear yard requirements of the applicable zon-

ing, the Court held that the Board of Adjustment had abused its discretion in failing to grant the property owner a variance. It found that requiring him to move the existing structure and, in the process, to destroy six large trees, constituted an unnecessary hardship to him without concomitant benefit to the public since the garage was already adequately separated from neighboring structures. The Court went on to hold that the variance requested, even though necessitated by the property owner's own action in seeking to convert the garage into a residence, could be granted, ". . . with due observance of 'the spirit of the ordinance' and with no insecurity to 'the public health, safety and public welfare.' " (358 Pa. at 641)

The ordinance provision governing the authorization of variances by the Board upon which the Court relied in the *Crawford* case contained a standard identical to that provided by statute for the City of Pittsburgh Board of Adjustment: "[variances may be authorized if they] will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of the ordinance will result in unnecessary hardship and so that the spirit of the ordinance shall be observed and substantial justice done." 53 P.S. §25057. Just as the Court found that standard to be met in the *Crawford* case, we find it satisfied here. Although the hardship was self-created in this case, the spirit of the ordinance was observed by permitting only a minimal deviation from the side yard requirements, and we hold that the Board committed neither an error of law nor an abuse of discretion in granting this variance.

The order of the court below affirming the decision of the Board of Adjustment is affirmed.