## Leisure Equities Corporation v.
## Pocono Township Board of Adjustment

*Lenard L. Wolfe,* for appellant.
*Richard E. Deetz,* for appellee.

WILLIAMS, P.J., August 26, 1974.—Leisure Equities Corporation has appealed from a decision of the Pocono Township Board of Adjustment, rendered on October 2, 1972, and reported by the chairman of the board in a letter dated October 3, 1972, directed to appellant's attorney, denying appellant's application for leave to erect 750 family dwelling units on 243 acres of land belonging to appellant and located in the Meisertown area of Pocono Township, Monroe County, Pa. The board has transmitted to this court the application dated June 27, 1972, together with an explanatory letter of even date, a copy of ordinance no. 16, the zoning ordinance of Pocono Township enacted on December 21, 1971, and a transcript of the hearing on appellant's application held before the board on August 24, 1972. Since no additional testimony was taken before this court, the scope of review is limited to a consideration of whether or not the board committed a manifest abuse of discretion or an error of law: Filanowski v. Zoning Board of Adjustment, 439 Pa. 360, 266 A. 2d 670 (1970); Pyzdrowski v. Pittsburgh Board of Adjustment, 437 Pa. 481, 263 A. 2d 426 (1970); Szmigiel v. Zoning Board of Adjustment, 6 Comm. Ct. 632, 298 A. 2d 629 (1972); Campbell v. Zoning Hearing Board of Plymouth Township, 10 Comm. Ct. 251, 310 A. 2d 444 (1973).

Pocono Township had no zoning ordinance until December 21, 1971, when the Board of Township Supervisors enacted ordinance no. 16. The ordinance establishes three classes of district in which residential uses are expressly permitted: R-1 residential, R-2 residential, and C commercial. It will be observed that the catalogues of uses assigned to each of these classes are not mutually exclusive. Any use permitted in R-1, the most restrictive of the three, is also permit-

ted in R-2 (section 501-1), and any use permitted in R-2 is also permitted in C (section 600-1), the least restrictive of the three classes. Multiple-family dwellings, although not permitted in R-1, are permitted in R-2 (sections 500 and 501-4) and, therefore, also in C (section 600-1). Apart from regulating the *geographical location* of various types of dwelling, the ordinance undertakes also to regulate *density* by requiring a land area of 43,560 square feet (one acre) for each family dwelling unit, regardless of whether the structure is to be located in R-1 (section 402-1), R-2 (section 502-1), or C (section 601-1). A similar requirement is imposed upon planned unit developments (section 1109-A), which the board is authorized to allow under the terms of section 1109.

Although it is clearly apparent that appellant's application to erect 750 family dwelling units upon a land area of 243 acres is in conflict with the one unit per acre density limitation imposed by the ordinance, counsel for appellant have chosen not to assert a direct challenge to the validity of this particular provision. Instead, they advance two alternative propositions: (1) that appellant had established a valid nonconforming use for multiple-family dwellings prior to enactment of the ordinance; *or* (2) that the ordinance is constitutionally invalid because it makes no provision, anywhere in the township, for *"townhouses."* It is argued that this alleged defect is fatal to the entire ordinance, which, in falling, would carry with it the density limitation, thus making it unnecessary to examine the reasonableness of this limitation as an exercise of the police power.

## I. NONCONFORMING USE

On this aspect of the case, the board found:

"The critical factor in our decision [to deny the

request for nonconforming use status] was the fact that although approval was sought as early as 1966 from the Monroe County Planning Commission and subsequently from the Pocono Township Planning Commission, official approval was never granted . . .

"The Board of Adjustment also makes the significant observation that over six (6) years have passed since approval was initially sought . . .

"It is our judgment that monies spent and investments made in that interim have been for a plan which has never had official sanction. We feel that efforts to develop an unapproved plan should not be construed as ample grounds for justifying the granting of a Non-Conforming Use, and that the risks of proceeding should have been clear and apparent to your corporation."

Reviewing the application and the transcript of the hearing, we find *no* evidence that appellant or its predecessors in title, at any time, or upon any fragment of their lands, constructed or even commenced to construct a multiple-family dwelling. On the contrary, Bernard Blier, a witness called on behalf of appellant, testified that he was unaware of the existence of "townhouses," appellant's designation for the type of multiple-family dwelling which it desires to construct, anywhere in Pocono Township. The geographical extent of appellant's present holdings, especially with reference to the zoning map incorporated in the ordinance, was developed before the board with only a limited degree of precision. In paragraph 1 of the notice of appeal, appellant's holdings are described as:

"243.43 acres more or less located on Legislative Route 45025 and *bounded on the East by Legislative Route 45081* in the Misertown [sic] area, Pocono

Township, Monroe County, Pennsylvania." (Emphasis supplied).

Neither the application nor the testimony provides a reference to title deeds from which precise legal descriptions or acreage measurements could be derived. At the hearing, John Lee, Director of Development Engineering for appellant, testified in response to a question put to him by counsel for appellant:

"Q. How did Leisure Equities come in possession of the tract of land in question?

"A. About 2½ years ago Fred Frankel and Properties Technology merged."

A measure of precision was introduced into evidence through appellant's exhibit no. 1, a plan captioned "Pocono Country Club Estates" which depicts the projected development of a tract of land surrounding the intersection of Pennsylvania Route 715 and Legislative Route 45025. This intersection provides a point of reference for orienting exhibit no. 1 on the zoning map of ordinance no. 16. One may observe that the portion of the tract lying to the north of Route 715 contains the projection of a system of streets and a number of single detached structures, while the portion to the south contains the projection of a system of streets or roads, some single detached structures, and, in addition thereto, several clusters of multiple-unit attached structures together with what well may be a golf course. The zoning map, at the area of this intersection, bears the legend "Pocono Country Estates" and a reproduction of the street system shown in the north portion of exhibit no. 1, giving rise to an inference that this part of the development plan already has received official sanction. The map does not, however, contain any such reproduction of the system shown in the south portion. Appellant's

claim of qualified official approval of the complete plan (including both the north and the south portions) is based partly upon writing appearing at the lower right-hand corner of exhibit no. 1 (almost illegible on the photo-copy furnished to the court, but from which the date "2-23-66" can be made out) and partly upon the testimony of John Lee, given under examination by counsel for appellant:

"A. In 1966 a preliminary plan was submitted to the Monroe County Planning Commission which at that time has a county ord. and requested preliminary approval on a plan to develop 444 dwellings units, townshouses and apartments."

". . .

"Q. . . . [W]hat action did they take?

"A. In March, 1966, the members of the Planning Commission of Monroe County approved the drawing or submitted in 'approved in concept'."

Appellant apparently relied upon this qualified approval in expending additional funds for development. Mr. Lee's testimony continued:

"Q. Pursuant to that approval by the Monroe County Planning Comm. was any work done?

"A. Some funds have been expended on the property in addition more detailed plans were prepared and completed approximately in the mid part of 1970.

"Q. In reference to planning, was any engineering firm obtained?

"A. Yes, an engineering firm of Marvin Bornfriend, Philadelphia, Pa.

"Q. From that time till now were there any other plans made?

"A. Yes, the planning of the property was then turned over to Morton W. Lerner, Philadelphia, Pa.

". . .

"Q. What work did they do?

"A. They took charge of the *areas that were not planned and filed.*[1] This plan then called for 1020 units and a 18 hole golf course. (Emphasis supplied)

". . .

"Q. Were any other stops pulled in reference to this project?

"A. In approximately Feb. of 72 the drafting project was handed over to Hess Associates as a job for detailed engineering work.

". . .

"Q. . . . [T]he physical work was done when?

"A. The plans called for the cut of a nine hole golf course, consisting of approximately 70% of the ground work of which was completed approximately late 69 early 70.

". . .

"Q. At that time that work was done, was anything else done to alter the character of the land?

"A. Yes, more road work.

"Q. When was that done?

"A. Approximately 1970.

"Q. Do you know how much money Leisure Equities has expended in doing the work which you have just numberated, both physical and planning?

"A. As of the end of July, 1972 the land and developing costs amounted to $317,339.00. Of that amount, $152,920.00 is in land and the rest is in developing and professional fees."

Counsel for appellant asked Mr. Lee to point out for the board the areas on exhibit no. 1 exactly where this work had been done, but, unfortunately, the

---

[1] This language suggests that, at the time of the hearing, the representatives of appellant may have been fully cognizant that the north portion of exhibit no. 1 already had been duly approved and recorded.

transcript does not reflect the results of his response. It cannot be said with assurance that the work of road-grading was expended upon the north portion, the south portion or both portions of the land shown in exhibit no. 1.

The sole evidence of *actual* on-site work was this testimony of grading roads and preparing a golf course. There exists no necessary connection between such work and the erection of a specific type of structure, here, multiple unit dwellings, because such improvements would be equally adaptable to other types of use. A connection appears only when one examines exhibit no. 1, which essentially is a graphic manifestation of appellant's *intention* to erect multiple unit dwellings at some future time, an intention which had not materialized even so late as the date of the hearing before the board. Evidence of this character is insufficient to establish a nonconforming use under the standard of Cook v. Bensalem Township Zoning Board of Adjustment, 413 Pa. 175, 179, 180, 196 A. 2d 327, 329, 330 (1964), where Mr. Justice Musmanno said:

"The appellant also argued in the court below that it was his specific intention, before the effective date of the ordinance, to convert his premises on the Street Road into a truck terminal. Advanced as may be the science of interpretation of psychic phenomena, the courts cannot be expected, nor are they equipped, to look into a person's mind to ascertain his thoughts and intentions. Only physical evidence manifested in the most tangible and palpable form can bring about the application of nonconforming clauses in a zoning ordinance. Before a supposed nonconforming use may be protected, it must exist somewhere outside the property owner's mind. This court said in Haller Baking Company's Appeal, 295 Pa. 257, that

while the phrase 'existing use' may be difficult to define, it is not difficult of determination: 'As understood in the ordinance, "existing use" should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose, i.e., the conduct of a business. Ordinarily an existing use for business combines two factors: (a) construction or adaptability of a building or room for the purpose, and (b) employment of the building or room or land within the purpose.' "

Counsel further asserts that appellant acquired a vested interest in the proposed use for multiple unit dwellings because the Monroe County Planning Commission "approved in concept" the plan depicted in exhibit no. 1 and appellant, relying thereon in good faith, expended $317,339 toward implementing the plan, citing Gulf Oil Corporation v. Fairview Township Board of Supervisors et al., 438 Pa. 457, 460, 266 A. 2d 84, 86 (1970). There, the applicant had, on December 21, 1967, received a permit to erect a gas station on certain property and, on December 28, 1967, had taken title and paid the $50,000 purchase price. On March 30, 1968, the township adopted an ordinance which zoned this property as residential, prohibiting erection of the proposed gas station. Subsequently, the township sought to revoke the permit, alleging that the new ordinance was "pending" at the time the permit was issued. The lower court found that the applicant had no knowledge of such pendency and directed that the permit be reinstated. The Supreme Court affirmed, and Mr. Justice O'Brien said:

"It [appellee] has a valid permit under the existing ordinance, it received the permit in good faith, and it spent money in reliance on its building permit. It has acquired a vested right to that permit."

This decision must be distinguished for the reason that, in the instant case, appellant failed to obtain the legal equivalent of a valid permit. Such an equivalent would call for unqualified approval of the plan by both the Monroe County Planning Commission *and* the Supervisors of Pocono Township. The Planning Commission was first created, with authority to regulate land subdivision, on July 15, 1965, by the Commissioners of Monroe County pursuant to power conferred by section 2001 of The County Code of August 9, 1955, P. L. 323 (No. 130, 16 PS § 2001. Since Pocono Township had no subdivision ordinance of its own until ordinance no. 4 was enacted on February 20, 1968, approval by the planning commission of all subdivision plans for Pocono Township filed between July 15, 1965, and February 20, 1968, was required by section 2004 of The County Code, 16 PS §2004. The obtaining of such approval did not, however, eliminate the necessity for also obtaining the approval of the Supervisors of Pocono Township, as required by section 1140.1, added to The Second Class Township Code of May 1, 1933, P. L. 103, by the Act of June 1, 1956, P. L. (1955) 2021, 53 PS §66140.1. While it may be inferred, as indicated above, that the supervisors already had approved the north portion of exhibit no. 1, there is no evidentiary basis for believing that they ever approved the south portion, which alone contains graphic representations of the type of mulitiple-unit dwelling structure for which appellant now seeks approval.

A case bearing a number of analogies to the present one is found in Clover Hill Farms, Inc. v. Lehigh Township Board of Supervisors et al., 5 Comm. Ct. 239, 241, 242, 289 A. 2d 778, 779, 780 (1972). There, in 1965, the appellant acquired 160 acres of land in Lehigh Township, Northampton County, for the sole

purpose of development as a mobile home park. During the same year, appellant expended approximately $3,000 in drawing up plans, making percolation tests, and digging three wells on the property. It also notified the Lehigh-Northampton Joint Planning Commission, a regional planning agency, of its plans for the tract and received advice as to the procedures for obtaining commission approval. As the result of financial difficulties, site development was suspended until 1970. At the time when the project was begun in 1965, Lehigh Township had no zoning ordinance; but, in 1968, a zoning ordinance was enacted which placed appellant's property in an agricultural district where mobile homes were not permitted. The supervisors refused appellant's request to rezone the property, and appellant appealed. The lower court dismissed the appeal on procedural grounds and the Commonwealth Court affirmed, but Judge Blatt commented by way of dictum, upon appellant's argument on the merits:

"It is appellant's contention, however, that it had a vested right to use its property as a mobile home park because of the activities it began in 1965, three years prior to the passage of the zoning ordinance. This argument, however, seems clearly without merit. As Justice Stearne said in Dunlap Appeal, 370 Pa. 31, 33, 87 A. 2d 299, 301 (1952): '(A) vested right to build in futuro a structure which violates a zoning ordinance can only be acquired by first securing a permit and thereafter expending substantial funds in reliance thereon.' Here the appellant's expenditure of $3,000 on activities which were not unique to mobile home parks, and could even have been applicable to permitted uses, was clearly not sufficient to establish a pre-existing usage as a mobile home park."

In the light of the foregoing authorities, as applied

to the evidence which was presented before the board, it is clear that the board of adjustment correctly concluded that appellant had failed to establish a valid nonconforming use.

## II. VALIDITY OF THE ZONING ORDINANCE

The procedure for challenging the substantive validity of a zoning ordinance, prescribed by the Pennsylvania Municipalities Planning Code of July 31, 1968, P. L. 805, 53 PS §11004, was modified by the amendatory Act of June 1, 1972, P. L. 238 (No. 93). Appellant's application in the instant case was filed 26 days thereafter on June 27, 1972. Act No. 93 did not become effective until 60 days after enactment, July 31, 1972, but it was in full force on August 24, 1972, when the hearing on the application was held before the Pocono Township Board of Adjustment. Thus, the amendatory act presents a dual aspect: viewed from the operational date, July 31, 1972, the relation of the act is *retrospective* toward the initial application, but *prospective* toward the hearing, the order of the board, and the appeal to this court. In the absence of any express provision in the act defining its application to pending litigation, resort may be had to section 96 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §596, which provides:

"The repeal of any civil provisions of a law shall not affect, or impair any act done, or right existing or accrued, or affect any civil suit, action or proceeding, *pending* to enforce any right under the authority of the law repealed. Such suit, action or proceeding shall and *may be proceeded with and concluded under the laws in existence when such suit, action or proceeding was instituted,* notwithstanding the repeal of such laws, *or the same may be proceeded with and concluded under the provisions of the new law,* if any, enacted." (Emphasis supplied)

For an example, section 96 was applied to sustain proceedings for the annexation of a borough, instituted in accordance with preexisting law during a period within which constitutional and statutory law governing annexation procedure was undergoing change. See Baldwin Borough Appeal, 217 Pa. Superior Ct. 346, 272 A. 2d 731 (1970). This section presented appellant with the opportunity to elect between proceeding (a) under the former law, or (b) under the law as amended.

It is apparent that appellant chose the former alternative. Choice of the latter would have entailed compliance, here completely lacking, with the following new requirements promulgated by the amendatory act: (1) A written request by appellant to the board to hold a hearing on its challenge, containing a short statement of the matter in issue and the grounds for the challenge: section 1004(2)(a), 53 PS §11004(2)(a). Actually, appellant's application contained no hint of an intended assault upon the validity of the ordinance. Attack was first presaged by the opening remarks of counsel at the hearing and implemented in the brief supplied to the board *after* the hearing had taken place; (2) public notice of the hearing, which shall include notice that the validity of the ordinance is in question, together with information as to the place where, and the times when, a copy of the landowner's request, including plans, may be examined by the public. This requirement evidences an intention of the legislature that zoning ordinances shall be invalidated only after the widest practicable opportunity has been afforded to the members of the public to bring their views and evidence to bear upon the resolution of such issues.

It is apparent that the board concurred with appellant in treating the application as being governed by the preexisting law. Although amended section 910,

53 PS §10910, now requires the board to decide *all* contested questions, the original section denied the board power to pass upon the validity of ordinance provisions. The board properly followed the original section 910 when it stated:

"As mentioned in your Brief, provisions do not specifically exist for the 'townhouse' type of development. We concede that such a provision should be considered. However, we feel that such a decision does not rest with the Board of Adjustment."

The function of making the initial determination of whether the ordinance is valid or not, therefore, falls to this court, pursuant to original section 1009(a) of the Municipalities Planning Code.

Analysis of appellant's rationale concerning this aspect of the case will show that it depends, in the first instance, upon the answers to two questions, one of fact and the other of law: (1) For *what type* of dwelling structure does appellant seek approval, and (2) does the zoning ordinance exclude this type of dwelling structure from *all* districts in Pocono Township? If the answer to the second question is positive, then, and then only, the consideration of three additional propositions of law will be in order: (3) Whether the totally exclusionary character of the ordinance provisions relating to the desired type of structure causes a shift in the burden of proof, and imposes upon the township the requirement of demonstrating that the challenged provisions are warranted by considerations affecting the public health, safety and welfare: Beaver Gasoline Co. v. Osborne Borough et al., 445 Pa. 571, 285 A. 2d 501 (1971); (4) Whether the township has presented no evidence to support this burden; and (5) Therefore whether the challenged provisions of the ordinance are constitutionally invalid.

There should be no mystery about the desired type of structure. Although Mr. Lee, in his explanatory letter attached to the application, described the project as embracing "750 living units with a majority being of two-story *townhouse* configuration" (Emphasis supplied), he enlarged the description in more functional terms when he testified before the Board:

". . . [I]t is the intent of Leisure Equities to develop a multi-family unit with a maximum of 750 unites [sic], ⅔ of this number would have a *townhouse* effect, tow [two] story configuration and ⅓ or 250 would be in a family living apartment configuration, 500 being the other." (Emphasis supplied)

Further light is obtained from the graphic representation in exhibit no. 1 showing, inter alia, a cluster of five row structures, three having eight dwelling units and two having nine dwelling units. This is the exhibit presented in support of appellant's claim of nonconforming use for the same type of structure as that now said to be excluded by the terms of the ordinance. Translating the application, the testimony, and the exhibit into structural terminology, the court finds as a fact that appellant seeks approval for dwellings having four characteristics: (1) The combination of more than two family dwelling units in each structure; (2) a building height of two stories; (3) construction of the dwelling units in attached, or row, formation; and (4) arrangement of the individual structures in groups or clusters. This description of type coincides with the concept of "townhouses" reflected in the language of two decisions cited by counsel for appellant, Rickert Nurseries v. Lower Makefield Township Zoning Hearing Board, 24 Bucks 201, 202 (C. P. Bucks Co., 1973), wherein President Judge Satterthwaite spoke of "townhouses" in the following terms:

"The project in question for which applicant-appellant sought zoning permits was the proposal to erect on 19.5 acres of a 22 acre tract a total of 105 townhouses or *attached* two-story, single-family dwellings. These townhouses, according to the evidence before the board, would be grouped in clusters of two to eight units each, arranged around the interior portion of the tract."

See also Camp Hill Development Co., Inc. v. Zoning Board of Adjustment, 13 Comm. Ct. 519, 319 A. 2d 197, 198 (1974), where Judge Rogers said:

"Camp Hill seeks to erect a development of 320 single family houses, built in blocks of six or eight, on a 20.5 acre tract located in the R-1 residential zoning district on the Borough's zoning map. These blocks of dwellings would be what used to be called row houses, but embellished and given some individuality are now referred to as townhouses. The proposed dwellings would be two stories in height, contain six rooms and each would be designed to accommodate but one family."

Inspection of ordinance no. 16 reveals that it *does* make provision for the type of dwelling structure although not designated by the particular term "townhouse," desired by appellant. At page 47 of the ordinance, the schedule of permitted land uses indicates that the use described as "Multi Family Residential" is permitted in districts R-2 and C. As to the first of these, section 500 provides:

"An R-2 Residence District is designed to accommodate multiple family units in accordance with and as set forth in Sections *501* to *503* hereof, or any amendments hereto, thereby allowing for greater variety of permissible uses, greater population density, and transition between major incompatible districts."

Section 501 provides:

"A lot may be used or occupied for . . .

"4. Multiple dwellings, provided that sanitation facilities are adequate to accommodate the proposed use, as determined by the Planning Commission."

Section 503 provides:

"No building shall exceed thirty-five feet (35') in height, provided that such height limit may be exceeded by one foot (1') for each foot by which the width of each side yard is increased beyond the minimum side yard requirements up to a maximum height of fifty feet (50')."

As to the second, or commercial districts, section 600-1 permits "Any use permitted in R-2 Residence Districts." Furthermore, section 1109, relating to Planned Unit Developments which are permitted according to the above-mentioned Schedule in Districts R-1, R-2, C, and RD, provides in part:

". . . Such development may be permitted by the Board for the purpose of encouraging the flexibility of design which will result in an integrated site plan designed to benefit the residents or occupants of such development and of neighboring properties, provide the maximum amount of open space obtainable, and shall . . . consist of either single family, two family or multi-family dwelling, or combinations thereof . . ."

Under section 300, Definition of Terms, a multi-family dwelling is defined as "A building designed and occupied exclusively as a residence for three or more families, also sometimes known as an 'Apartment Dwelling' "; row houses are defined as "Three or more attached dwellings each fronting on the same street, separated by unpierced party walls"; and attached building is defined as "A structure with enclosing walls as well as two (2) party walls in common with adjacent buildings."

The foregoing survey impels the conclusion that ordinance no. 16 does not exclude from all districts in Pocono Township the type of dwelling structure for which appellant has made application. Furthermore, inspection of the zoning map will show, notwithstanding the averment in the application that all of appellant's lands are zoned R-1, that a portion of appellant's lands lie within a C Commercial zone, where such structures are a permitted use.

### ORDER

And now, August 26, 1974, the order of the Pocono Township Board of Adjustment dated October 2, 1972, is affirmed, and the appeal of Leisure Equities Corporation is dismissed.