## Ackerman v. Upper Mount Bethel Township

*Ronald W. Shipman,* for appellants.
*Richard J. Haber,* for appellee.
*John Molnar,* for intervenor.

WILLIAMS, *P.J.,* January 23, 1989—This matter is presently before the court on the appeal of Earl and Margaret D. Ackerman from the adoption of a zoning ordinance amendment on November 30, 1987, by the Upper Mount Bethel Township Board of Supervisors. Pursuant to Pa.R.C.P. 1038 we make the following

## FINDINGS OF FACT

(1) Appellants reside at R.D. 1, Mount Bethel, Pennsylvania 18343, in the Township of Upper Mount Bethel.

(2) The supervisors of Upper Mount Bethel Township at the time relevant to the events herein were Ronald Angle, Ernest Gearhart and Allen Haddad.

(3) The intervenor, Bethel Heights Associates Inc. (BHA), consists of five shareholders and is a business corporation with a mailing address of P.O. Box 797, Dover, New Jersey. BHA owns land in Upper Mount Bethel Township.

(4) On October 13, 1987, BHA submitted a petition to the Board of Supervisors of Upper Mount Bethel Township to amend the township zoning ordinance. Specifically, BHA requested that two existing Medium-High Density Residential Districts (R-3) and portions of a Medium Density Residential District (R-2) and an Agricultural Rural Residential District (AR) be changed to a Low Density Residential District (R-1).

(5) Margaret Conroy, secretary-treasurer for the township, published notice of the public hearing to be held on the proposed amendment in the Easton

*Express* on November 9 and 16, 1987. The hearing was scheduled for November 30, 1987.

(6) The Vacancy Board of Upper Mount Bethel Township appointed Allen Haddad to the Board of Supervisors in October 1987. Haddad attended at least two public meetings prior to the November 30, 1987, meeting.

(7) During the morning of November 30, Haddad stopped by the township building to review township matters. He informed Angle that he felt uncomfortable and unprepared with regard to the meeting to be held that evening. The basis for his concern was that he had never met Roy Olsen, a contractor-engineer and member of BHA, and that certain issues arising from the proposed amendment disturbed him.

(8) Angle suggested that Haddad "bounce the issues" off Olsen. Haddad expressed a desire to speak with Olsen prior to the evening meeting. Angle agreed to arrange a conference.

(9) At approximately 4:00 p.m. on November 30, 1987, Haddad, Angle and Olsen met in the township building. Gearhart was invited, but chose not to attend. Angle and Haddad constituted a quorum of the Board of Supervisors. The meeting lasted 30 minutes.

(10) Haddad asked Olsen if he would be able to "live with whatever restrictions" were put upon his proposed planned residential development if the zoning amendment was adopted. Haddad wanted to be certain that Olsen would not take advantage of the situation and exceed the initial proposed development. Another concern of Haddad's was the type of sewerage facilities that would serve the development.

(11) At the beginning of the 4:00 p.m. meeting, Angle asked if he should leave the room. Haddad

felt that Angle could benefit from the questions he had for Olsen and asked Angle to remain. Angle participated minimally during the meeting.

(12) Neither Haddad nor Angle voted, or took any official action, at the 4:00 p.m. meeting.

(13) A well-attended public hearing took place in the township municipal building at 7:30 p.m. on November 30, 1987. Haddad asked the witnesses the same basic questions he had discussed with Olsen earlier in the day. The supervisors adopted the amendment unanimously.

## DISCUSSION

A non-jury trial was held in this matter before Williams Jr., *P.J.*, on July 19, 1988. The court heard the testimony of several witnesses and received numerous exhibits into evidence. Since this zoning amendment appeal involved additional evidence and issues not before the township Board of Supervisors, the matter is subject to our de novo review. *Pyzdrowski v. Pittsburgh Board of Adjustment*, 437 Pa. 481, 485, 263 A.2d 426, 429 (1970); *Cooper v. Board of Adjustment*, 412 Pa. 429, 433, 195 A.2d 101, 103 (1963); *Boss v. Zoning Hearing Board of the Borough of Bethel Park*, 66 Pa. Commw. 89, 443 A.2d 871 (1982). We therefore base our decision in this case upon the merits, and not whether the Board of Supervisors abused its discretion or committed an error of law.[1]

Appellants contend that at 4:00 p.m. on November 30, 1987, a quorum of the Board of Supervisors of Upper Mount Bethel Township met privately and discussed agency business in direct contravention

---

1. At oral argument the township solicitor (who had not been in office at the time of these meetings) disavowed his brief and argued on behalf of the appellants.

of the Sunshine Act, 65 P.S. §271 et seq. As a result of such misconduct, appellants argue, the court must exercise its discretion under 65 P.S. §283 and strike the action taken at the public meeting which occurred at 7:30 p.m. that evening.

The intervenor, BHA, strenuously contests appellants' position that the 4:00 p.m. meeting constituted a violation of the Sunshine Act. BHA argues that Angle was not present during the entire one-half hour session with Haddad and Olsen, and that Haddad and Angle did not discuss "agency business," nor did they deliberate, so as to violate the act. Even if the court were to rule that a violation occurred, BHA posits, no "official action" was taken and the court does not have the power to invalidate the ordinance enacted at a properly advertised public meeting.

In our opinion the procedure followed here by Angle and Haddad is exactly what the revised Sunshine Act was intended to prevent. Although we believe that Haddad's error may have been an innocent one—and there has been no suggestion that it was otherwise—his inexperience in municipal government does not excuse the statutory violation which occurred.

Since there is little case law under the act, a detailed analysis of the statute is warranted. Section 272 sets forth the public policy of the act as follows:

"§272. Legislative findings and declarations—

"(a) *Findings*—The General Assembly finds that *the right of the public to be present at all meetings of agencies and to witness the deliberation,* policy formulation and decision making of agencies is vital to the enhancement and proper functioning of the democratic process and that secrecy in public affairs undermines the faith of the public in govern-

ment and the public's effectiveness in fulfilling its role in a democratic society.

"(b) *Declarations*—The General Assembly hereby declares it to be the public policy of this commonwealth to insure the *right of its citizens to have notice of and the right to attend all meetings of agencies at which any agency business is discussed or acted upon* as provided in this act." (emphasis supplied)

Section 274 sets forth the requirement that:

"Official action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public unless closed under section 7, 8 or 12."

The relevant definitions from section 273 are as follows:

" 'Agency business'—The framing, preparation, making or enactment of laws, policy or regulations, the creation of liability by contract or otherwise or the adjudication of rights, duties and responsibilities, but not including administrative action."

" 'Deliberation'—The discussion of agency business held for the purpose of making a decision."

" 'Meeting'—Any prearranged gathering of an agency which is attended or participated in by a quorum of the members of an agency held for the purpose of deliberating agency business or taking official action."

" 'Official action'—

"(1) Recommendations made by an agency pursuant to statute, ordinance or executive order.

"(2) The establishment of policy by an agency.

"(3) The decisions on agency business made by an agency.

"(4) The vote taken by any agency on any motion, proposal, resolution, rule, regulation, ordinance, report or order."

With these definitions in mind, it is clear that the 4:00 p.m. meeting was not open to the public, was prearranged by Angle, all of the supervisors were invited, it was attended by a quorum of the board, and there was discussion concerning an ordinance pending before the township. It was intended to and specifically gave Haddad information for the purpose of making a decision. Although Angle testified that he did not participate in the discussion and was in attendance for only one-third of the time, there is substantial evidence to the contrary. Haddad stated that Angle stayed for the meeting because Haddad so requested and that Angle participated in the discussion, albeit "minimally." In addition, Olsen did not disagree with Haddad's recollection of the events which transpired at the meeting. Both Angle and Haddad testified that no *votes* were taken at the afternoon meeting. Olsen also stated that votes were not discussed at that meeting, nor did he receive a commitment from either supervisor about how each would vote. However, it is clear that "deliberations" occurred at the afternoon meeting.

BHA suggests that in reliance on *Bradford Area Education Association v. Bradford Area School District,* 528 Civil 1988, Bradford County, Cleland, *P.J.,* what occurred in this case did not constitute the "discussion" of agency business. In that case the court quoted *Webster's New Collegiate Dictionary* definition of "discussion" as "the consideration of a question in open debate, argument for the sake of arriving at truth or clearing up difficulties. Discuss implies the sifting or examining, especially by presenting considerations pro and con" and the *International Dictionary* definition as "to argue by presenting various sides of a question, to debate fully and openly. To discuss is to sift or examine by present considerations pro and con." The court then

ruled that there was no discussion or deliberation when members of a school board merely asked questions of their own administrator.

In the present case the record indicates that the BHA application was "discussed" by Angle, Haddad and Olsen. The line between merely obtaining information and discussion of the matter is too fine to draw. In addition, the facts in *Bradford* indicate an extensive series of public meetings and discussion before action was taken. Were we to approve the private meeting which occurred a few hours prior to the public hearing in this case, we would encourage a return to private meetings of governmental officials when matters are discussed and debated and the public meeting is a mere rubber stamp without any public opportunity to witness the deliberations. The expressed intent of the legislature is to the contrary.[2]

---

2. In so ruling we believe that what was said in *Palm v. Center Township,* 52 Pa. Commw. 192, 415 A.2d 990 (1980), and quoted with approval in *Belle Vernon Area Concerned Citizens et al. v. Board of Commissioners of the Township of Rostraver,* 87 Pa. Commw. 474, 487 A.2d 490 (1985), concerning the duty of legislators to be informed is still good law *provided* it is not done in the context of a "meeting" as defined by the Sunshine Act. That quotation is as follows:

"The 'Sunshine Act' provides that 'formal actions' of agencies such as a Board of Township Supervisors must be made in public meetings open to the public. It is the duty of a school board member, a commission, a councilman, or a supervisor to be informed. *Supervisors are not restricted to information furnished at a public meeting. A supervisor has the right to study, investigate, discuss and argue problems and issues prior to the public meeting at which he may vote. Nor is a supervisor restricted to communicating with the people he represents.* He is not a judge. *He can talk with interested parties as does any legislator.*

. . .

"*Nor is a supervisor prohibited from listening to and*

The remedy for violation of the Sunshine Act is found in section 283:

"Should the court determine that the meeting did not meet the requirements of this act, it may in its discretion find that *any or all official action taken at the meeting* shall be invalid." (emphasis supplied)

It is clear that no "official action," *supra,* occurred at the 4:00 p.m. meeting. However, we reject an interpretation of this section which would provide no remedy except summary criminal proceedings where an improper meeting occurred but formal action was deferred until the open meeting.

BHA contends that in this case the court should not exercise its discretion to invalidate the zoning ordinance because a full public hearing was held in which the earlier private meeting was revealed and all of the issues considered there were fully discussed. The appellants argue that unless the ordinance is invalidated, there is no penalty for violating the Sunshine Act. There is merit to both arguments. Certainly in the absence of a public hearing, the ordinance would be stricken.

The court has reviewed the transcript of the public hearing which had been properly advertised and was well attended. In addition to Olsen and BHA's engineer, numerous citizens questioned both

*talking with the applicant for a zoning change* whether the applicant be a resident or non-resident, a taxpayer or non-taxpayer. Any person affected by a township ordinance has the right to expect a township supervisor or other official with responsibility in the area to be reasonably cooperative, to listen, and to avoid obstructive tactics. He can advise and make suggestions. *If a supervisor recognizes a problem he is free to relate it and discuss it with all interested persons.* None of this means a commitment until a decision is made and formal action taken at a public meeting." *Belle Vernon* at 480-1, 487 A.2d at 493-4. (emphasis in original)

the supervisors and the proponents concerning the zoning amendment and related matters. There was extensive discussion of the issues, including those raised by Haddad at the earlier meeting, as well as the advantages and disadvantages of the proposal to the township. At its conclusion the ordinance was adopted by a 3-0 vote of the supervisors. This action "was not a plan adopted in secret and then foisted on an unsuspecting public," *Bradford, supra,* nor is there any evidence that it was a mere rubber stamp approval. Under the circumstances in this case, we will not set aside the adoption of the ordinance and require the costly process of enactment to begin anew.

Appellants have raised additional arguments relating to an alleged violation of the Code of Ethics by Angle and Haddad. The inferences drawn by appellant are not supported by the evidence and they are dismissed.

## ORDER OF COURT

And now, January 23, 1989, the appeal from the November 30, 1987, adoption of the zoning amendment to the Upper Mount Bethel Township zoning ordinance is dismissed. Costs are placed upon the township.