Ernest P. Raum, Robert F. Esslinger and Citizens Organized to Reclaim Chesterbrook, an Unincorporated Association, By Emanuel Lauria and Phyllis Ayoob, Trustees Ad Litem, *v.* The Board of Supervisors of Tredyffrin Township and Intervenors Richard L. Fox, Greenview Associates, and Picket Post Village, Inc., Appellants.

Appeal of Ernest P. Raum, Robert F. Esslinger, and Citizens Organized to Reclaim Chesterbrook, an Unincorporated Association, By Emanuel Lauria and Phyllis Ayoob, Trustees Ad Litem (from the decision of the Zoning Hearing Board of Tredyffrin Township) *v.* Zoning Hearing Board of Tredyffrin Township and Intervenors Richard L. Fox, Greenview Associates and Picket Post Village, Inc., Appellants.

Main Line Housing Improvement Corporation, a Non-Profit Corporation, Main Line Community Association, an Unincorporated Association, By Joseph Spampinato, President as Trustee Ad Litem and Joseph Spampinato, Individually, and Patricia Spampinato, His Wife, et al., and on Behalf of Others Similarly Situated, Appellants, *v.* The Zoning Hearing Board of Tredyffrin Township and Tredyffrin Township, Appellees.

428

Argued February 3, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, MENCER, ROGERS and BLATT. Judge WILKINSON, JR., did not participate.

*Richard L. Bazelon,* with him *William T. Coleman, Jr.,* and *Dilworth, Paxson, Kalish, Levy & Coleman,* for appellants in 1322 and 1323 C.D. 1974, and appellees in 1386 C.D. 1974.

*Lawrence E. Wood,* with him *Wood, Parke & Barnes,* for appellees.

*David H. Moskowitz,* with him *Mark Schwartz* and *William Cullerton,* for appellant, Main Line Housing Improvement Corporation.

OPINION BY JUDGE CRUMLISH, JR., July 25, 1975:

Consolidated for disposition are the appeals of landowner-developers and intervening protestants from an order of the Court of Common Pleas of Chester County invalidating Ordinance No. 267 of Tredyffrin Township under which landowners were granted preliminary approval of a development known as Chesterbrook in Tredyffrin Township and building permits to begin construction of an initial phase of Chesterbrook (Nos. 1322 and 1323 C.D. 1974), and which further denied intervening protestants' standing to challenge the allegedly exclusionary impact of Ordinance No. 267 in failing to affirmatively provide for low income housing (No. 1386 C.D. 1974).

These appeals, although generating a record of massive proportion and involving the development of more than 850 acres of Tredyffrin Township in Chester County, do not require a detailed history to frame the legal issues raised. In December of 1970, Tredyffrin Township (Township) amended its comprehensive plan to designate a 1,000 acre portion of the Township as a Unified Development Area (U.D.A.). The objective of the U.D.A. designation was to have "this area planned as an entity and developed over a period of years in accordance with a unified plan, rather than on a lot-by-lot, piece-meal sub-

division basis. Basic components of the U.D.A. would be the retention of broad bands of open space along the many stream valleys in the area; a large percentage of the area devoted to other open space uses such as playgrounds, play fields, swimming pools, tennis courts, and golf courses; a mix of lot sizes and dwelling types; community uses such as schools, and a library; convenience neighborhood shopping areas; and such other uses as are determined to be desirable components of a high quality and economically viable community." Five months after the public announcement of the amendments to the comprehensive plan, Richard J. Fox, Greenview Associates and Picket Post Village, Inc. (hereinafter "Fox"), as legal or equitable owners of a substantial portion of the land designated within the U.D.A., applied for a rezoning of its land from R-½ Residential[1] to five zoning districts extant in other areas of the Township, ranging from RC-Rural Conservation (recreational open space) to C-2 Commercial (retail and light commercial), to enable it to develop a project of mixed residential and commercial uses as envisioned by the comprehensive plan. This planned development became known as Chesterbrook. Fox proposed the development of Chesterbrook over a ten year period to contain 177 single family, detached dwellings clustered on 135.6 acres; 1238 townhouses on 137.5 acres; 1590 garden apartment and mid-rise apartment units on 247.3 acres; office, motel and community retail and recreational facilities on 135.5 acres; with the remainder of the tract to be preserved as open space and proposed school sites.

---

1. The comprehensive plan recommended retention of the R-½ Residence classification for the land within the U.D.A. until the zoning standards fixing the uses permitted within the area were established by the Township Board of Supervisors. Residential uses within an R-½ district are limited to single-family detached dwellings on minimum lots of 100,000 square feet.

The Board of Supervisors referred the Chesterbrook rezoning application to the Planning Commission for its recommendations, and numerous hearings and executive sessions were held thereafter by both bodies in an attempt to hammer out the details of the plan and to obtain commitments from the developer. The first legislative implementation of the U.D.A. concept occurred in November of 1971 when Ordinance No. 264 was enacted. This ordinance added section 2003 to the Township zoning ordinance, setting forth in some detail the content requirements of a developmental plan submitted for U.D.A. consideration, and the respective duties of the Planning Commission and Board of Supervisors in reviewing these plans. Subsection 4 of 2003 binds a developer to the plan submitted for approval together with the requirements of the standard use district if the zoning ordinance is amended to accommodate the plan. On March 12, 1972, the Board of Supervisors enacted Ordinance No. 267 adopting the Chesterbrook proposal *en toto*, together with certain commitments made by Fox which were a matter of record.

Timely appeal from the adoption of Ordinance No. 267 was taken to the Court of Common Pleas of Chester County by two residents of the Township and a civic group calling itself Citizens Organized to Reclaim Chesterbrook (hereinafter collectively referred to as CORC). The dispostion of this appeal was postponed by stipulation of the parties, however, to enable Fox to apply to the zoning officer for a preliminary opinion of Chesterbrook's consistency with Ordinance No. 267,[2] and to apply for subdivision approval and building permits for the R-1 portion of Chesterbrook. Upon Fox's receipt of these approvals, CORC appealed to the Township Zoning Hear-

---

2. Section 1005(b) of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §11005(b) (MPC).

ing Board (zoning board).[3] Main Line Housing Improvement Corporation, Main Line Community Association, and numerous individuals alleging to be residents of the Township who either lived in substandard housing and desired to reside within Chesterbrook if subsidized housing were provided or who desire low-income housing to be provided within Chesterbrook, and non-residents of the Township who lived in substandard housing and desired to live in Chesterbrook were low-income housing provided (hereinafter collectively referred to as "Main Line," unless otherwise indicated), were thereafter permitted to intervene as appellants before the zoning board. Main Line simultaneously filed a cross complaint against the Township and Board of Supervisors alleging an exclusionary effect of Chesterbrook and Ordinance No. 267 because it failed to provide for low income housing. On May 16, 1973, the zoning board upheld Ordinance No. 267 and the permits issued to Fox thereunder. CORC and Main Line appealed to the Court of Common Pleas which consolidated the appeals with CORC's prior procedural appeal. On September 30, 1974, the lower court reversed the zoning board, invalidating Ordinance No. 267 under *Eves v. Zoning Board of Adjustment,* 401 Pa. 211, 164 A. 2d 7 (1960), because it failed to provide sufficient standards to guide the Board of Supervisors' determination of the uses and the location of uses permitted within the U.D.A. The court also denied standing to Main Line on the ground that they failed to establish that they had ever applied for a permit in the Township or were otherwise adversely affected by the enactment of Ordinance No. 267. Both Fox and Main Line appealed these determinations to this Court, and a limited supersedeas of the lower court's order in 1322 and 1323 C.D. 1974 was granted on November 27, 1974.

---

3.  Sections 910, 915 and 1005 of the MPC, 53 P.S. §§10910, 10915 and 11005.

Since the court below did not take additional evidence, our scope of review, as was that of the lower court, is limited to a determination of whether the zoning board abused its discretion or committed an error of law. *Camaron Apartments, Inc. v. Zoning Board of Adjustment of Philadelphia,* 14 Pa. Commonwealth Ct. 571, 324 A. 2d 805 (1974), *Surrick v. Upper Providence Township Zoning Hearing Board,* 11 Pa. Commonwealth Ct. 607, 314 A. 2d 565 (1974). Because the Fox appeals and the Main Line appeal involve distinct challenges to the validity of Ordinance No. 267, we will discuss each separately.

*Nos. 1322 and 1323 C.D. 1974*

The Fox appeals raise three issues for our determination:

1) Is Ordinance No. 267 invalid because it fails to provide adequate standards by which the Board of Supervisors could determine the classification, density and location of uses permitted in a U.D.A.?

2) Can the U.D.A. concept envisioned by the Township's comprehensive plan be effectuated by standard zoning under Article VI of the MPC, or was the Township required to proceed under the Planned Residential Developments (PRD) provisions contained in Article VII of the MPC?

3) Did the Board of Supervisors have sufficient evidence of the potential environmental impact of Chesterbrook before it when it enacted Ordinance No. 267?

The lower court invalidated Ordinance No. 267 solely on the basis of the Supreme Court's decision in *Eves v. Zoning Board of Adjustment, supra.*[4] A review of *Eves,*

---

4. The court below dismissed CORC's procedural challenge to the advertising of Ordinance No. 267. As CORC has not appealed from that portion of the lower court's decision and does not raise the question here in support of the court's order, we will not consider it on appeal.

however, reveals an entirely dissimilar situation from the instant appeal. In *Eves,* the Court had before it a "flexible selective zoning" scheme which created in some detail an F-1 Limited Industrial District, but did not affix the boundaries of the district to any area in the township. The district was thus allowed to "float," coming to earth only upon the application of a landowner who had the requisite acreage for a rezoning of his property to F-1. This zoning scheme was invalidated because it 1) was not in accordance with a comprehensive plan; and 2), gave the township supervisors unfettered discretion in determining appropriate land uses on a case-by-case basis.[5] Without discussing the limitation of the *Eves* "in accordance with a comprehensive plan" holding by subsequent decisions,[6] there can be no question that Ordinance No. 267 specifically implements the U.D.A. concept established by the 1970 amendment to the Township's comprehensive plan, and specifically brings to earth the uses permitted within the U.D.A. Any contention that Ordinance No. 267 fails to provide adequate standards for the Board of Supervisors to pass upon individual applications for land development within the U.D.A. overlooks the fact that the ordinance simply applies five standard districts then extant in other areas of the Township to specific portions of the U.D.A. as delineated in the Chesterbrook proposal. In developing Chesterbrook, Fox must comply with the requirements of the standard zoning districts delineated in the zoning ordinance as well

5. As corollary holdings, the Court also found the flexible selective zoning scheme to encourage spot zoning and to give property owners or prospective property owners little notice of the nature of the uses permitted within the vicinity.

6. *See Village 2 at New Hope, Inc. Appeals,* 429 Pa. 626, 241 A. 2d 81 (1968) ; *Doran Investments v. Muhlenberg Township Board of Commissioners,* 10 Pa. Commonwealth Ct. 143, 309 A. 2d 450 (1973) ; *Marino v. Zoning Hearing Board of Harrison Township,* 1 Pa. Comonwealth Ct. 116, 274 A. 2d 221 (1971).

as the additional commitments made as a part of its application for a rezoning. Suffice it to say, that these requirements are specific and comprehensive and adequately guide the appropriate zoning and planning bodies of the Township in considering further applications by Fox for zoning approvals within Chesterbrook.[7]

---

7. As an example, for the R-1 district in the northeast corner of Chesterbrook for which Fox received a building permit for the initial construction of single family detached dwellings, sections 601 and 602 of the Township's zoning ordinance provide:

"SECTION 601. USE REGULATIONS. A building may be erected, altered or used and a lot may be used or occupied for any of the following purposes, and no other:

"1. Single-family detached dwelling.

"2. Church or similar place of worship.

"3. Township administrative building, public library, public park, play or recreation area; or any similar use owned or operated by a public or private non-profit agency.

"4. Local public utility line, bus shelter, provided that no advertising shall be affixed thereto.

"5. The following uses when authorized as a special exception, subject to the general standards prescribed in Section 1606 and 1909:

"(a) Educational, religious or philanthropic use, other than a use permitted in this Section above, including a college or seminary; kindergarten or child nursery; a convent, monastery or similar religious institution; a historical or cultural museum not operated for profit; a general, medical or surgical hospital, sanitarium or similar health facility; and an institution for children, the aged, the indigent or the handicapped; provided that it shall contain no more than 50 beds and be located on a lot of not less than five acres; but not including a correctional or penal institution.

"(b) Conversion of a dwelling to two-family or multiple-family use, subject to the provisions of Section 1607.

"(c) Telephone central office, electric substation or any similar governmental or public utility use, provided that (1) no such use shall include an office open to the general public, the storage of materials, rotating equipment, trucking or repair facilities, housing of work crews, a storage garage or any structure involving major traffic movements, (2) the portion of any such use not

The real thrust of CORC and the lower court's difficulty with the planning process resulting in Ordinance No. 267 is that prior to Fox's application for a rezoning there was no way of determining the specific uses and the location of such uses which would be permitted within a U.D.A. This contention, however, misapprehends the function and standards required of a comprehensive plan as distinguished from a zoning ordinance implementing a comprehensive plan. As this Court said in *Morelli v. Borough of St. Mary's,* 1 Pa. Commonwealth Ct. 612, 617, 275 A. 2d 889, 891-892 (1971): "The comprehensive plan does not have the legal effect of a zoning ordinance, which actually regulates the land use as may be recommended by the comprehensive plan. The planning commission may recommend all kinds of desirable approaches

---

located within a building is enclosed or adequately screened in such a manner as to not detract from the character of the District, and (3) no advertising shall be affixed to any structure.

"(d)  Non-profit golf or country club, swimming club, tennis club or similar recreational facility on a lot not less than five acres in size, provided that (1) the chief activity shall not be one that is customarily carried on as a business, (2) no building shall be closer than 100 feet to a street or property line, (3) the buildings or services shall be for the use of members and their guests only, and (4) the use shall comply with the provisions of Section 401.6(c), Subsections (7) to (9) relating to privately owned outdoor recreational uses in RC Districts.

"(e)  Any other governmental or public utility use, provided that the Zoning Hearing Board shall determine that the placement of such use in the proposed district is a public necessity and that satisfactory screening and other measures are taken to safeguard the character of the surrounding area.

6.  Accessory use as permitted in Section 401-7.

"SECTION 602.  AREA AND HEIGHT REGULATIONS RELATING TO DWELLINGS. The following area, width and height regulations shall apply in the case of any lot used as a dwelling.

"1.  LOT AREA AND WIDTH. A lot area of not less than 30,000 square feet and a lot width of not less than 100 feet at the building line shall be provided for every building

to land utilization and development. Not all of these may become eventually legally enforceable in a zoning ordinance. In other words, a comprehensive plan is abstract and recommendatory, whereas the zoning ordinance is specific and regulatory." Such a pattern of planning and rezoning was carefully followed here. The U.D.A. designation added to the comprehensive plan in 1970 established for the specific area in question "general guideposts and guidelines . . . for the guidance of zoning policy," *Cleaver v. Board of Adjustment,* 414 Pa. 367, 377, 200 A. 2d 408, 414 (1974); and Ordinance No. 267 effectuated these policies by creating fixed geographic districts of specific use classifications. The fact that Fox initiated the rezoning and Ordinance No. 267 essentially adopts the Chesterbrook proposal does not put the "zoning cart before the planning horse" as suggested by CORC. As a practical matter, many rezonings occur upon the request of a landowner, and these rezonings are not invalid so long as they do not amount to spot zoning or special legislation, and they otherwise conform with the spirit of the comprehensive plan. *Village 2 at*

---

hereafter erected or used as a dwelling, subject to the provisions of Section 1601 relating to a non-conforming lot.

"2. BUILDING AREA. Not more than 20 percent of the area of each lot may be occupied by buildings.

"3. FRONT YARD. There shall be a front yard on each street on which the lot abuts, the depth of which shall be at least 40 feet.

"4. SIDE YARDS. For any dwelling and its accessory buildings there shall be two side yards not less than 40 feet in aggregate width and neither less than 15 feet in width.

"5. REAR YARD. There shall be a rear yard, the depth of which shall be at least 25 feet.

"6. HEIGHT. The height of a dwelling, or a building accessory thereto, shall not exceed three stories nor 35 feet."

In addition, R-1 development in Chesterbrook would be governed by the "special development" regulations of Section 1603 of the ordinance dealing with landscaping, buffer zones, and highway frontage and provision for access.

438

*New Hope, Inc. Appeals, supra; Marino v. Hearing Board of Harrision Township, supra.*

Nor do we find persuasive CORC's argument that the U.D.A. zoning, as conceived by the Township's comprehensive plan and implemented by Ordinances Nos. 264 and 267, exceeded the Township's standard zoning powers under Article VI of the MPC, 53 P.S. §10601 et seq. The thrust of this argument is that the U.D.A., envisioning an integrated, multi-use "mini-town" ordinarily developed as a PRD, can only be effectuated under the procedures of Article VII of the MPC, 53 P.S. §10701 et seq., dealing with PRDs. We will not dwell upon this contention for long because CORC, once again, overlooks the fact that Ordinance No. 267 does *not* create multi-use zoning districts. Rather, the ordinance designates specific areas of the U.D.A. as single-use districts conforming to the requirements of standard zoning classifications already existing in the Township.[8] This is entirely consistent with the zoning powers authorized by Article VI, and we agree with the lower court that the Legislature did not manifest an intent to limit innovations in standard zoning, such as a U.D.A., by the enactment of Article VII.

---

8. A "planned residential development" is defined by the MPC as "an area of land, controlled by a landowner, to be developed as a single entity for a number of dwelling units, the development plan for which does *not correspond in lot size, bulk or type of dwelling, density, lot coverage and required open space to the regulations established in any one residential district created, from time to time, under the provisions of a municipal zoning ordinance.*" (Emphasis supplied.) Section 107(14), 53 P.S. §10107(14), When Ordinance No. 267 is viewed as creating five distinct standard use districts, it becomes readily apparent that the Board of Supervisors did not contemplate an implementation of Article VII—PRD procedures as the uses, densities and other regulations for the separate districts within the U.D.A. were identical to provisions extant in other districts in the Township. *See Gettys v. Dillsburg Borough,* 7 Pa. Commonwealth Ct. 519, 300 A. 2d 805 (1973), *aff'g per curiam* 85 York L. Rec. 193 (1972).

CORC finally challenges Ordinance No. 267 on the ground that the Board of Supervisors had insufficient information relative to the environmental impact of Chesterbrook prior to undertaking the rezoning. Although the lower court did not reach this issue as it held Ordinance No. 267 invalid under *Eves*, it did indicate that evidence of the impact of Chesterbrook on Valley Forge State Park and the immediate vicinity was sorely lacking, and it would have been inclined to remand to the zoning board for additional evidence. We have carefully reviewed the record before us and find more than substantial evidence to sustain the zoning board's findings in this regard.[9] Prior to the enactment of Ordinance No. 267,

---

9.  CORC bases its argument that an environmental impact study must be undertaken by municipality before it effects a rezoning of the magnitude of Ordinance No. 267 upon the fiduciary obligation of a municipality, as a creature of the state, to effectuate Article I, Section 27 of the Pennsylvania Constitution, Article I, Section 27 states:

"The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania public natural resources are the common property of the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people." This contention assumes that Article I, Section 27 is self-executing, an assumption shared by a majority of this Court, *see Bruhin v. Kassab*, 14 Pa. Commonwealth Ct. 300, 320 A. 2d 907 (1974), and further that a municipality assumes the role of the Commonwealth as a public trustee. *See* Eichbaum, *Environmental Planning—A Legal Guide to Development in Pennsylvania*, 19 Vill. L. R. 712, 726-731 (1974). We do not address the latter question here, however, as we find substantial evidence of the Township's consideration of the potential environmental impact of Chesterbrook prior to the adoption of Ordinance No. 267. But, query whether a municipality's duty in this respect has not already been satisfied by the adoption of a zoning and subdivision ordinance and the requirement of a developer to comply with the comprehensive environmental protection laws of the Commonwealth? *See Larwin Multihousing Pennsylvania Corp. v. Commonwealth*, 19 Pa. Commonwealth Ct. 181, 343 A.2d 83 (1975, (footnote 8)).

Fox presented to the Board of Supervisors a detailed environmental synthesis of the site, including studies dealing with the prevention of erosion and flooding during the construction stages and as Chesterbrook is developed, the location and treatment of open space to preserve natural vegetation, and the prevention of further pollution of the streams running through Chesterbrook. Fox has made binding commitments for the preservation of historic buildings within Chesterbrook, the construction of retention basins to minimize surface flooding and the protection of recreational facilities within the flood plain. As this Court stated in *Payne v. Kassab,* 11 Pa. Commonwealth Ct. 14, 29, 312 A. 2d 86, 94 (1973):
"(Article I), Section 27 was intended to allow the normal development of property in the Commonwealth, while at the same time constitutionally affixing a public trust concept to the management of public natural resources of Pennsylvania. The result of our holding is a controlled development of resources rather than no development." Similarly, the Board of Supervisors here was faced with the inevitable development of the tract within the U.D.A., and the choice at the preliminary stage of considering a rezoning was whether the Chesterbrook proposal gave reasonable assurances of a minimum adverse impact to the environment. From this record, we cannot say that the Board erred in this respect. Further assurance of an environmental sensitivity is adequately provided by the Township's subdivision regulations and the environmental protection laws of this Commonwealth with which Fox must comply in order to obtain sewer, water, erosion and siltration, and building permits as the developer of Chesterbrook progresses.[10]

------

10. As an example of this continuing environmental review, see the *Chesterbrook Conservancy v. Commonwealth of Pennsylvania, Department of Environmental Resources and The Fox Company,* EHB Docket No. 73-418-W (1974), wherein the Environ-

In sum, we conclude that Ordinance No. 267 is valid as conforming with the comprehensive plan, provides sufficient standards to guide the approval of developments thereunder, is authorized under Article VI of the MPC, and reflects a reasonable consideration of the environmental impact of the uses permitted thereunder.

*No. 1386 C.D. 1974*

The Main Line appeal presents a broad frontal attack upon the constitutionality of the entire zoning of the Township as allegedly exclusionary of poor people, and specifically upon Ordinance No. 267 as continuing this allegedly exclusionary policy by failing to require the developer to affirmatively provide for low-income, governmentally subsidized housing. Before addressing these issues, however, we must determine whether appellants making up Main Line had standing to appeal, *i.e.*, whether any is an "aggrieved person" within the meaning of Section 1005 of the MPC.[11]

The lower court found it unnecessary to differentiate between the respective interests of the civic associations and the resident and non-resident appellants composing Main Line because it was not alleged that any of these parties had ever applied for a permit to develop low-income housing within the Township, or that Ordinance No. 267 had been enacted or enforced to their detriment. We believe that this view construes too narrowly the requirements of standing, and merges standing with

_____

mental Hearing Board upheld the issuance of an erosion and sediment control permit to Fox by the Department of Environmental Resources for an 80 acre portion of Chesterbrook for which the building permits giving rise to this appeal were issued.

11. A review of the record indicates that Fox properly raised an objection to Main Line's standing before the zoning board in its counterstatement of issues submitted, and this objection was properly preserved on appeal. Thus, we dismiss Main Line's contention that this issue was waived.

another aspect of justiciability, *i.e.*, the ripeness of a constitutional challenge to a zoning ordinance. In each of the decisions relied upon by the lower court,[12] the determinative issue was not the standing of the particular litigant, but whether the court could decide a constitutional challenge to an ordinance *in vacuo*, before it had been actually applied to a litigant and without the benefit of a specific developmental plan proposed by the litigant. Here, there can be no question of the ripeness of Main Line's attack. Fox obtained preliminary approval of the Chesterbrook development contemplated by Section 1005 (b) of the MPC, 53 P.S. §11005(b), thus keying the thirty day period in which an appeal challenging the substantive validity of the underlying ordinance could be taken by protestants. Additionally, a permit was obtained by Fox for the first stage of residential construction in the northeast corner of Chesterbrook. These events were enough to concretely frame the constitutional issues involved.

We have little difficulty concluding that the residents of the Township, especially those presently living in substandard housing appealing in their own behalf or as members of the civic associations composing Main Line appellants, have a sufficient interest in the outcome of this litigation to have standing. It has traditionally been held that residents of a municipality have a legal interest in preserving the integrity of their zoning ordinance and the status of their property thereunder so as to be "aggrieved persons," thereby enabling them to challenge an amendatory ordinance as unconstitutional. *See Roeder v. Hatfield Borough Council, supra; Penny v. Warrington*

12. *Roeder v. Hatfield Borough Council*, 439 Pa. 241, 266 A. 2d 691 (1970); *Home Life Insurance Company of America v. Board of Adjustment*, 393 Pa. 447, 143 A. 2d 21 (1958); *Commonwealth v. Bucks County*, 22 Bucks Co. L. Rep. 179 (1972), *aff'd per curiam*, 8 Pa. Commonwealth Ct. 295, 302 A. 2d 897 (1973), *cert. denied*, 414 U.S. 1130 (1974).

*Township Board of Supervisors,* 21 Bucks C.L. Rep. 322 (1971); *Tredyffrin Construction Company Appeal,* 7 Ches. Co. Rep. 153 (1956).[13] Having decided the resident appellants composing Main Line have standing, the remaining appellants would have derivative standing, and our prior decisions relative to the standing of non-residents[14] and civic associations[15] are not determinative of this appeal. We therefore reach the merits of Main Line's attack.

The crux of Main Line's challenge is that the Township's zoning is exclusionary in that it fails to provide for its "fair share" of housing opportunities for low and moderate income persons under *Concord Township Appeal,* 439 Pa. 466, 268 A. 2d 765 (1970); *Girsh Appeal,* 437 Pa. 237, 263 A. 2d 395 (1970); *National Land and Investment Co. v. Easttown Township Board of Adjustment,* 419 Pa. 504, 215 A. 2d 597 (1965); *Township of Willistown v. Chesterdale,* 7 Pa. Commonwealth Ct. 453, 300 A. 2d 107 (1973). *See also Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel,* 67 N.J. 151, 336 A. 2d 713 (1975). Assuming that we hold the Township's zoning to be exclusionary, Main Line argues that the "fair share" concept be implemented by requiring Fox to affirmatively allocate and develop a portion of Chesterbrook as low moderate income housing

13. Our definition of "person aggrieved" in *Cablevision v. Zoning Hearing Board of Easton,* 13 Pa. Commonwealth Ct. 232, 235, 320 A. 2d 388, 390 (1974), to require a showing of a direct pecuniary interest in the litigation, must be interpreted in the context of the fact that the party there involved was not a resident of the municipality in which the zoning permit was issued.

14. *See Lightcap v. Board of Supervisors of Wrightstown Township,* No. 1625 C.D. 1973, Pa. Commonwealth Ct., October 18, 1974, *aff'g per curiam,* 25 Bucks Co. L. Rep. 145 (1973).

15. *See Northampton Residents Association v. Northampton Township Board of Supervisors,* 14 Pa. Commonwealth Ct. 515, 322 A. 2d 787 (1974).

units, or that the Township be ordered to plan and zone for such housing.[16]

We do not decide the question of the appropriate remedy here, however, as we cannot agree that the Township is exclusionary when considered in light of the rezoning achieved by Ordinance No. 267, adopting the Chesterbrook proposal. At best, the record establishes that over the past decade the percentage of low income (and minority) residents of the Township has declined, while the development proceeding in the Township has been in the nature of single-family dwellings and apartments affordable by persons of above average income. The evidence, however, does not establish that this direction in suburban growth is attributable to the zoning of the Township. Rather, it would appear to be attributable to the high cost of land and accessory services common to municipalities within access of the Philadelphia metropolitan area. This basic fact of life does not render the zoning of the Townshop exclusionary. *Upper St. Clair Township v. Commonwealth*, 13 Pa. Commonwealth Ct. 71, 317 A. 2d 906 (1974). Given the high density, multiple-family uses permitted under Ordinance No. 267, which at the time the Chesterbrook development was approved provided for housing units for as low as $18,000.00, we can only conclude that Main Line has failed

---

16. We note that the only decision squarely confronting a requirement that a private developer provide for a percentage of low income units in a proposed development held that such a requirement constituted an unlawful taking of private property without due process of law. *The Board of Supervisors of Fairfax County v. De Groff Enterprises, Inc.*, 214 Va. 235, 198 S. E. 2d 600 (1973). With regard to the affirmative relief requested against the Township by the cross-complaint filed by Main Line, we would be inclined to agree with the court below that it does not present a justiciable issue absent a specific development proposed by Main Line. *See Warth v. Seldin*, 43 U.S.L.W. 4906 (U.S. June 24, 1975). In light of our subsequent discussion, however, we reserve a determination of these issues for a more appropriate case.

to sustain its burden of proving the Township's zoning to be exclusionary.

Consistent with the foregoing, we reverse the order of the court below in the appeals docketed at 1322 C.D. 1974 and 1323 C.D. 1974, and affirm the dismissal of the appeal docketed at 1386 C.D. 1974.

CONCURRING OPINION BY JUDGE MENCER:·

I concur in the result reached here and with the majority opinion except the determination that the Main Line appellants have standing to appeal. I do not view any of them as an "aggrieved person" within the meaning of Section 1005 of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §11005. *See Louden Hill Farm, Inc. v. Milk Control Commission,* 420 Pa. 548, 217 A. 2d 735 (1966); *Atlee Estate,* 406 Pa. 528, 178 A. 2d 722 (1962); *Levitt and Sons, Inc. v. Kane,* 4 Pa. Commonwealth Ct. 375, 285 A. 2d 917 (1972).