Village 2 at New Hope, Inc. Appeals.

Argued January 16, 1968. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Lenard L. Wolffe,* with him *Edward I. Dobin, Carl K. Zucker,* and *Curtin & Heffner,* for appellant.

*William Miller,* of the New Jersey Bar, with him *David H. Moskowitz,* for appellees.

OPINION BY MR. JUSTICE ROBERTS, April 24, 1968:

Under traditional concepts of zoning the task of determining the type, density and placement of buildings which should exist within any given zoning dis-

trict devolves upon the local legislative body. In order that this body might have to speak only infrequently on the issue of municipal planning and zoning, the local legislature usually enacts detailed requirements for the type, size and location of buildings within each given zoning district, and leaves the ministerial task of enforcing these regulations to an appointed zoning administrator, with another administrative body, the zoning board of adjustment, passing on individual deviations from the strict district requirements, deviations known commonly as variances and special exceptions. At the same time, the overall rules governing the dimensions, placement, etc., of primarily public additions to ground, e.g., streets, sewers, playgrounds, are formulated by the local legislature through the passage of subdivision regulations. These regulations are enforced and applied to individual lots by an administrative body usually known as the planning commission.

This general approach to zoning fares reasonably well so long as development takes place on a lot-by-lot basis, and so long as no one cares that the overall appearance of the municipality resembles the designed achieved by using a cookie cutter on a sheet of dough. However, with the increasing popularity of large scale residential developments, particularly in suburban areas, it has become apparent to many local municipalities that land can be more efficiently used, and developments more aesthetically pleasing, if zoning regulations focus on density requirements rather than on specific rules for each individual lot. Under density zoning, the legislature determines what percentage of a particular district must be devoted to open space, for example, and what percentage used for dwelling units. The task of filling in the particular district with real houses and real open spaces then falls upon the planning commission usually working in conjunction with

an individual large scale developer. See *Chrinko v. South Brunswick Twp. Planning Bd.*, 77 N.J. Super. 594, 187 A. 2d 221 (1963). The ultimate goal of this so-called density or cluster concept of zoning is achieved when an entire self-contained little community is permitted to be built within a zoning district, with the rules of density controlling not only the relation of private dwellings to open space, but also the relation of homes to commercial establishments such as theaters, hotels, restaurants, and quasi-commercial uses such as schools and churches. The present controversy before this Court involves a frontal attack upon one of these zoning districts, known in the trade as a Planned Unit Development (hereinafter PUD).

Spurred by the desire of appellant developer to construct a Planned Unit Development in the Borough of New Hope, in December of 1964 borough council began considering the passage of a new zoning ordinance to establish a PUD district in New Hope. After extensive consultation with appellant, council referred the matter to the New Hope Planning Commission for further study. This body, approximately six months after the project idea was first proposed, formally recommended to council that a PUD district be created. Council consulted with members of the Bucks County Planning Commission on the text of the proposed ordinance, held public hearings, and finally on June 14, 1965 enacted ordinance 160 which created the PUD district, and ordinance 161 which amended the borough zoning map, rezoning a large tract of land known as the Rauch farm from low density residential to PUD. Pursuant to the procedural requirements of ordinance 160, appellant presented plans for a Planned Unit Development on the Rauch tract to the borough planning commission. These plans were approved on November 8, 1965, and accordingly four days later two

building permits, known as zoning permits 68 and 69, were issued to appellant. (Some question exists as to the current status of these permits, see text infra.) Subsequently, permit number 75 was issued. Appellees, all neighboring property owners opposing the issuance of these permits, appealed to the zoning board of adjustment. The board, after taking extensive testimony, upheld ordinances 160 and 161 and accordingly affirmed the issuance of the permits. Appellees then appealed to the Court of Common Pleas of Bucks County. That tribunal took no additional testimony, but reversed the board, holding the ordinances invalid for failure to conform to a comprehensive plan and for vesting too much discretion in the New Hope Planning Commission. This Court granted certiorari under Supreme Court Rule 68½.

The procedural posture of this case is identical to that of *National Land & Investment Co. v. Easttown Twp. Bd. of Adjustment,* 419 Pa. 504, 523, 215 A. 2d 597, 607 (1965). Our scope of review may thus be stated by reference to that decision: "The zoning enabling act being silent as to a right of appeal, we consider this case on broad certiorari, reviewing the testimony, the evidence, and the entire record. Keystone Raceway Corp. v. State Harness Racing Comm'n, 405 Pa. 1, 173 A. 2d 97 (1961); Schmidt v. Philadelphia Zoning Bd. of Adjustment, 382 Pa. 521, 114 A. 2d 902 (1955). Because the court below took no additional testimony, we will look at the decision of the board of adjustment to determine if, in upholding . . . [ordinances 160 and 161], the board committed an abuse of discretion or an error of law. Upper Providence Twp. Appeal, 414 Pa. 46, 198 A. 2d 522 (1964)." Applying this standard, we hold that no error of law or abuse of discretion was committed by the New Hope Board of Adjustment, and that therefore the Court of Common Pleas of Bucks County must be reversed.

## I.

Approximately one year before the PUD seed was planted in New Hope, borough council had approved the New Hope Comprehensive Plan. This detailed land use projection clearly envisioned the Rauch tract as containing only single family dwellings of low density. The court below therefore concluded that the enactment of ordinance 160, and more specifically the placing of a PUD district on the Rauch tract by ordinance 161 was not "in accordance with a comprehensive plan," as required by the Act of February 1, 1966, P. L. (1965) 1656, §3203, 53 P.S. §48203. See also *Eves v. Zoning Bd. of Adjustment,* 401 Pa. 211, 164 A. 2d 7 (1960).

The fallacy in the court's reasoning lies in its mistaken belief that a comprehensive plan, once established, is forever binding on the municipality and can never be amended. Cases subsequent to *Eves* have made it clear, however, that these plans may be changed by the passage of new zoning ordinances, provided the local legislature passes the new ordinance with some demonstration of sensitivity to the community as a whole, and the impact that the new ordinance will have on this community. As Mr. Chief Justice Bell so artfully stated in *Furniss v. Lower Merion Twp.,* 412 Pa. 404, 406, 194 A. 2d 926, 927 (1963) : "It is a matter of common sense and reality that a comprehensive plan is not like the law of the Medes and the Persians; it must be subject to reasonable change from time to time as conditions in an area or a township or a large neighborhood change." This salutary rule that comprehensive plans may be later amended by the passage of new zoning ordinances has been approved not only in *Furniss,* but also in *Donahue v. Zoning Bd. of Adjustment,* 412 Pa. 332, 194 A. 2d 610 (1963)

and *Key Realty Co. Zoning Case,* 408 Pa. 98, 182 A. 2d 187 (1962).

Given this rule of law allowing post-plan zoning changes, and the presumption in favor of an ordinance's validity, see *National Land,* supra at 521-22, 215 A. 2d at 607, we are not in a position, having reviewed the record in the present case, to say that the zoning board committed an abuse of discretion or an error of law when it concluded that ordinances 160 and 161 were properly passed. Presented as it was with evidence that the PUD district had been under consideration by council for over six months and had been specifically recommended by the borough planning commission, a body specially equipped to view proposed ordinances as they relate to the rest of the community, we hold that the board, within its sound discretion, could have concluded that council passed the ordinances with the proper overall considerations in mind. The PUD district established by ordinance 160 is not the type of use which by its very nature could have no place in the middle of a predominantly residential borough. It is not a steel mill, a fat rendering plant, or a desiccated egg factory. It is, in fact, nothing more than a miniature residential community.

Closely tied to the comprehensive plan issue is the argument raised by appellees that ordinances 160 and 161 constitute spot zoning outlawed by *Eves,* supra. Given the fact situation in *Eves,* however, as well as the post-*Eves* cases, we do not believe that there is any spot zoning here. In *Eves,* the municipality created a limited industrial district, F-1, which, by explicit legislative pronouncement, was not to be applied to any particular tract until the individual landowner requested that his own tract be so re-zoned. The obvious evil in this procedure did *not* lie in the fact that a limited industrial district might be placed

in an area previously zoned, for example, residential. The evil was the *pre-ordained* uncertainty as to where the F-1 districts would crop up. The ordinance all but invited spot zoning where the legislature could respond to private entreaties from landowners and re-zone tracts F-1 without regard to the surrounding community. In *Eves,* it was almost impossible for the F-1 districts to conform to a comprehensive plan since tracts would be re-zoned on a strictly ad hoc basis.

Quite to the contrary, no such "floating zone" exists in the present case. On the very day that the PUD district was created by ordinance 160, it was brought to earth by ordinance 161; and, as discussed supra, this *was* done "in accordance with a comprehensive plan." Speaking of a similar procedure in *Donahue v. Zoning Bd. of Adjustment,* 412 Pa. 332, 194 A. 2d 610 (1963), this Court faced squarely an attack based upon *Eves* and responded thusly: "It was this case by case review [in *Eves*] which demonstrated the absence of a comprehensive plan and which sought to enable the board of supervisors [the local legislative body] to exercise powers they did not statutorily possess.

"In the instant case, the new classification was established and the zoning map amended within a very short period of time [in the case at bar, on the same day]. Under the rules of statutory construction which are likewise applicable to ordinances, see Cloverleaf Trailer Sales Co. v. Pleasant Hills Borough, 366 Pa. 116, 76 A. 2d 872 (1950); Philadelphia v. Phillips, 179 Pa. Superior Ct. 87, 116 A. 2d 243 (1955); these ordinances should be read together as one enactment. See Statutory Construction Act, May 28, 1937, P. L. 1019, §62, 46 P.S. §562. So construed, ordinances 151 [creating new zone] and 155 [amending zoning map] do not create the 'floating zone', anchored only upon

case by case application by landowners, which we struck down in Eves. While it is true that the change here was made upon request of a particular landowner, this does not necessarily create the evils held invalid in Eves where the defects were specifically created by the very terms of the ordinances. It is not unusual for a zoning change to be made on request of a landowner, and such change is not invalid if made in accordance with a comprehensive plan." 412 Pa. at 334-35, 194 A. 2d at 611. We think *Donahue* is completely controlling on the issue of alleged spot zoning and compels the conclusion that ordinances 160 and 161 do not fall on that ground. See also the excellent discussion of *Eves* and its progeny in Krasnowiecki, Legal Aspects of Planned Unit Development, Technical Bull. 52, Urban Land Institute, pp. 20-22 (1965).

## II.

The court below next concluded that even if the two ordinances were properly *passed*, they must fall as vesting authority in the planning commission greater than that permitted under Pennsylvania's zoning enabling legislation. More specifically, it is now contended by appellees that complete project approval by the planning commission under ordinance 160 requires that commission to encroach upon legislative territory whenever it decides where, within a particular PUD district, specific types of buildings should be placed.

In order to appreciate fully the arguments of counsel on both sides it is necessary to explain in some detail exactly what is permitted within a PUD district, and who decides whether a particular landowner has complied with these requirements. Admittedly the range of permissible uses within the PUD district is greater than that normally found in a traditional zon-

ing district. Within a New Hope PUD district there may be: single family attached or detached dwellings; apartments; accessory private garages; public or private parks and recreation areas including golf courses, swimming pools, ski slopes, etc. (so long as these facilities do not produce noise, glare, odor, air pollution, etc., detrimental to existing or prospective adjacent structures); a municipal building; a school; churches; art galleries; professional offices; certain types of signs; a theatre (but not a drive-in); motels and hotels; and a restaurant. The ordinance then sets certain overall density requirements. The PUD district may have a maximum of 80% of the land devoted to residential uses, a maximum of 20% for the permitted commercial uses and enclosed recreational facilities, and must have a minimum of 20% for open spaces. The residential density shall not exceed 10 units per acre, nor shall any such unit contain more than two bedrooms. All structures within the district must not exceed maximum height standards set out in the ordinance. Finally, although there are no traditional "set back" and "side yard" requirements, ordinance 160 does require that there be 24 feet between structures, and that no townhouse structure contain more than 12 dwelling units.

The procedure to be followed by the aspiring developer reduces itself to presenting a detailed plan for his planned unit development to the planning commission, obtaining that body's approval and then securing building permits. Of course, the planning commission may not approve any development that fails to meet the requirements set forth in the ordinance as outlined above.

We begin with the observation that there is nothing in the borough zoning enabling act which would prohibit council from creating a zoning district with

this many permissible uses. The applicable section of The Borough Code is the Act of February 1, 1966, P. L. (1965) 1656, §3201, 53 P.S. §48201. Under this section, council is given the power to regulate and restrict practically all aspects of buildings themselves, open spaces, population density, location of structures, etc.; the only limitation on this power being that it be exercised so as to promote the "health, safety, morals or the general welfare" of the borough. Under the same act, §1601, 53 P.S. §46601, empowers council to adopt ordinances to govern the use of public areas, such as streets, parks, etc., again with the only limitation being that such ordinances create "conditions favorable to the health, safety, morals and general welfare of the citizens." Thus, if council reasonably believed that a given district could contain *all* types of structures, without *any* density requirements whatsoever, so long as this did not adversely affect health, safety and morals, such a district could be created. In fact, it is common knowledge that in many industrial and commercial districts just such a wide range of uses is permitted. Given such broad power to zone, we cannot say that New Hope Borough Council abrogated its legislative function by creating a PUD district permitting the mixture of uses outlined supra, especially given the density requirements.

We must next examine the statutory power of the borough planning commission to determine whether such an administrative body may regulate the internal development of a PUD district. The Act of February 1, 1966, P. L. (1965) 1656, §1155, 53 P.S. §46155 requires that all plans for land "laid out in building lots" be approved by the planning commission before they may be recorded. Thus, the traditional job of the commission has been to examine tract plans to determine whether they conform to the applicable borough

ordinances. The ordinances most frequently interpreted and applied by the planning commission are those dealing with streets, sewers, water and gas mains, etc., i.e., the so-called public improvements. However, the statute contains no language which would prohibit the planning commission from approving plans with reference to ordinances dealing with permissible building uses as well. The primary reason that planning commissions have not traditionally interpreted this type of ordinance is that such regulations do not usually come into play until the landowner wishes to begin the actual construction of a particular building. By this time, the relevant subdivision plan has already been approved by the commission; thus the task of examining the plans for a particular structure to see whether it conforms to the regulations for the zoning district in which it will be erected devolves upon the local building inspector who issues the building permit.

However, in the case of PUD the entire development (including specific structures) is mapped out and submitted to the administrative agency at once. Accordingly, the requirements set forth in a PUD ordinance must relate not only to those areas traditionally administered by the planning commission, but also to areas traditionally administered by the building inspector. Therefore, quite logically, the job of approving a particular PUD should rest with a single municipal body. The question then is simply which one: Borough Council (a legislative body), the Planning Commission (an administrative body), or the Zoning Board of Adjustment (an administrative body)?

There is no doubt that it would be statutorily permissible for council itself to pass a PUD ordinance and simultaneous zoning map amendment so specific that no details would be left for any administrator. The

ordinance could specify where each building should be placed, how large it should be, where the open spaces are located, etc. But what would be the practical effect of such an ordinance? One of the most attractive features of Planned Unit Development is its flexibility; the chance for the builder and the municipality to sit down together and tailor a development to meet the specific needs of the community and the requirements of the land on which it is to be built. But all this would be lost if the Legislature let the planning cement set before any developer could happen upon the scene to scratch his own initials in that cement. Professor Krasnowiecki has accurately summed up the effect on planned unit development of such legislative planning. The picture, to be sure, is not a happy one: "The traditional refuge of the courts, the requirement that all the standards be set forth in advance of application for development, does not offer a practical solution to the problem. The complexity of pre-established regulations that would automatically dispose of any proposal for planned unit development, when different housing types and perhaps accessory commercial areas are envisaged, would be quite considerable. Indeed as soon as various housing types are permitted, the regulations that would govern their design and distribution on every possible kind of site, their relationship to each other and their relationship to surrounding properties must be complex unless the developer's choice in terms of site, site plan, and design and distribution of housing is reduced close to zero. It is not likely . . . that local authorities would want to adopt such a set of regulations." Krasnowiecki, Planned Unit Development: A Challenge to Established Theory and Practice of Land Use Control, 114 U. Pa. L. Rev. 47, 71 (1965). Left with Professor Krasnowiecki's "Hobson's choice" of no developer leeway at all, or a stag-

gering set of legislative regulations sufficient to cover every idea the developer might have, it is not likely that Planned Unit Development could thrive, or even maintain life, if the local legislature assumed totally the role of planner.

The remaining two municipal bodies which could oversee the shaping of specific Planned Unit Developments are both administrative agencies, the zoning board of adjustment and the planning commission. As this Court views both reality and zoning enabling act, the zoning board of adjustment is not the proper body. The Act of February 1, 1966, P. L. (1965) 1656, §3207(g), 53 P.S. §48207(g) specifically sets forth the powers of a borough zoning board of adjustment. These powers are three in number, and only three. The board may (1) hear and decide appeals where there is an alleged error made by an administrator in the enforcement of the enabling act or any ordinance enacted pursuant thereto; (2) hear and decide special exceptions; and (3) authorize the grant of variances from the terms of existing ordinances. These powers in no way encompass the authority to review and approve the plan for an entire development when such plan is neither at variance with the existing ordinance nor is a special exception to it; nor does (1) above supply the necessary power since the board would not be reviewing an alleged administrative error.

Moreover, from a practical standpoint, a zoning board of adjustment is, of the three bodies here under discussion, the one least equipped to handle the problem of PUD approval. Zoning boards are accustomed to focusing on one lot at a time. They traditionally examine hardship cases and unique uses proposed by landowners. As Professor Krasnowiecki has noted: "To suggest that the board is intended, or competent, to handle large scale planning and design decisions is,

I think, far fetched" Technical Bulletin 52, Urban Land Institute, p. 38 (1965). We agree.

Thus, the borough planning commission remains the only other body both qualified and statutorily permitted to approve PUD. Of course, we realize that a planning commission is not authorized to engage in actual re-zoning of land. But merely because the commission here has the power to approve more than one type of building for a particular lot within the PUD district does not mean that the commission is usurping the zoning function. Indeed, it is acting in strict *accordance* with the applicable zoning ordinance, for that ordinance, No. 160, *permits* more than one type of building for a particular lot. To be sure, if the commission approved a plan for a PUD district where 30% of the land were being used commercially, *then* we would have an example of illegal re-zoning by an administrator. But no one argues in the present case that appellant's plan does not conform to the requirements of ordinance 160.

Nor is this Court sympathetic to appellees' argument that ordinance 160 permits the planning commission to grant variances and special exceptions. We fail to see how a development such as appellant's that meets every single requirement of the applicable zoning ordinance can be said to be the product of a variance or a special exception. The very essence of variances and special exceptions lies in their *departure* from ordinance requirements, not in their compliance with them. We therefore conclude that the New Hope Planning Commission has the power to approve development plans submitted to it under ordinance 160.

### III.

One further matter remains for discussion. Technically, we are faced today with five separate appeals.

Although the procedural posture of some of them is practically impossible to unravel, we shall nevertheless attempt to do so. Chronologically, the case has proceeded in the following manner. Appellees originally commenced two proceedings in equity to enjoin the issuance of building permits 68 and 69. Appellant filed preliminary objections to these actions in the nature of a demurrer, contending that a bill in equity will not lie to contest the application of a zoning ordinance. In response to these preliminary objections, the court below issued two of its five orders of May 1, 1967 stating that the equity actions may have become moot by virtue of the court's holding that ordinances 160 and 161 are invalid. The order therefore recited that further action on appellant's preliminary objections would be deferred pending the finality of the court's orders vis-a-vis ordinances 160 and 161. Appellant has appealed these orders of May 1, arguing that the court below should have sustained the preliminary objections, rather than deferring decision on them. The appeals are docketed in this Court as Nos. 110 and 111. The court below was, of course, correct in concluding that the equity actions would have become moot had this Court sustained its finding that ordinances 160 and 161 were invalid. However, since we hold that these ordinances are valid, some disposition of the equity actions must now be made.

In this regard we believe that the proper forum to resolve the grant or denial of appellant's preliminary objections is the court below, for the simple reason that, as to this Court, the appeals are from interlocutory orders and must be quashed. The orders entered below in the two equity cases were merely orders deferring any decision on preliminary objections. Thus, the effect of both orders was to suspend the proceedings temporarily, pending the outcome of three related

appeals. We have clearly held that "a suspension of proceedings for a temporary period is not an appealable order." *Keasbey's Trust Estate,* 342 Pa. 439, 445, 20 A. 2d 281, 283 (1941); cf. *Reynolds Metals Co. v. Berger,* 423 Pa. 360, 223 A. 2d 855 (1966).

Nor does the fact that the preliminary objections went to equity's jurisdiction alter the appealability vel non of the orders below. Although the Act of March 5, 1925, P. L. 23, §1, 12 P.S. §672 makes appealable all preliminary *determinations* as to the jurisdiction of a lower tribunal, it cannot fairly be said that orders *deferring* the preliminary determination of jurisdiction fall within the statutory language. Finally, while we note that no motion to quash was presented, this Court may take such action on its own motion. *Steel v. Levy,* 282 Pa. 338, 127 Atl. 766 (1925); *Kennedy v. Banbury Equipment Corp.,* 202 Pa. Superior Ct. 242, 195 A. 2d 832 (1963). Accordingly, we shall quash appeals Nos. 110 and 111.

Subsequent to the filing of the two equity actions, appellees went before the zoning board of adjustment to contest the issuance of building permits 68 and 69. On January 17, 1966 the board sustained both permits. On January 26, 1966 and February 2, 1966, respectively, appeals from the board's decision were taken to the court of common pleas. However, before the court could render a decision, both permits were allegedly revoked on February 14, 1966. On April 11, 1966 a third building permit, number 75, was issued and its issuance appealed to the zoning board of adjustment. As with permits 68 and 69, the board upheld the issuance of permit 75 on July 1, 1966. Finally, on July 27, 1966 the board's decision on permit 75 was appealed to the court of common pleas. In addition to its two May 1, 1967 orders on the equity cases, the court below, on May 1, also entered three separate orders de-

claring permits 68, 69 and 75 null and void as issued pursuant to invalid ordinances. Appeals from these orders appear on our docket as Nos. 112, 113 and 114.

We find ourselves both confused and troubled by the orders of the court below invalidating permits 68 and 69, for it is contended by appellees that these permits had been revoked by borough council prior to the decision of that court. If this be true and if borough council has power to revoke permits,* then permits 68 and 69 should never have been before the court below. If, as alleged, permits 68 and 69 were properly revoked on February 14, 1966, appellant's remedy would have been an appeal, within a reasonable time, to the zoning board of adjustment. Act of February 1, 1966, P. L. (1965) 1656, §3207(d), 53 P.S. §48207(d). No such appeal was ever taken. (The only appeals to the zoning board in this case were taken by the present appellees from the original *issuance* of permits 68, 69 and 75.)

The only faint explanation of what really occurred here is found on page 571a of the record. During the zoning board's hearing on permit 75, counsel for appellant stated that he did not appeal the revocation of permits 68 and 69 since, in his view, these permits were never legally revoked. He claimed that the purported act of revocation was made by council, whereas only the building inspector or the board of adjustment was empowered to perform this act. Neither the board nor the court below has ever ruled on this contention. Nor, in fact, have the parties explained the current status of these permits to this Court.

---

*The Act of February 1, 1966, P. L. (1965) 1656, §3207(d), 53 P.S. §48207(d) apparently contemplates that only the zoning "administrative officer" (the building inspector) is empowered in the first instance to revoke building permits.

With the record in such utter confusion as to whether permits 68 and 69 were revoked and by whom, this Court must remand the case for further proceedings. If the court below finds that the building permits 68 and 69 were legally revoked on February 14, 1966, as appellees contend, then today's decision as to ordinances 160 and 161 would have no effect on the status of these permits. If, however, they were not legally revoked, then they must be allowed to remain in existence, along with permit 75, as issued pursuant to valid ordinances.

The appeals from the orders of the Court of Common Pleas of Bucks County in appeals No. 110 and No. 111 are quashed. The orders of the court in appeals No. 112 and No. 113 are vacated and the records remanded for further proceedings consistent with this opinion. The order of the court in appeal No. 114 is reversed.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.