801 A.2d 492

**Elizabeth BAILEY, Sandy Wynn, Joseph Walker, and Richard Metz**

**v.**

**ZONING BOARD OF ADJUSTMENT OF THE CITY OF PHILADELPHIA, the City of Philadelphia and James B. Kravitz/Shawmont Development, Inc.**

**Appeal of James B. Kravitz/Shawmont Development Inc.**

Supreme Court of Pennsylvania.

Argued Oct. 16, 2001.

Resubmitted May 31, 2002.

Decided July 17, 2002.

148

150

Carl S. Primavera, Glenn A. Weiner, Stephen C. Eglin, Philadelphia, for James B. Kravitz/Shawmont Development, Inc.

Cheryl L. Gaston, Philadelphia, for Zoning Board of Adjustment of the City of Philadelphia.

Debra Valenti–Epstein, Philadelphia, for Elizabeth Bailey, et al.

Before: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION OF THE COURT

Justice NIGRO.

Appellants Shawmont Development, Inc., and its president, James B. Kravitz, appeal from the Commonwealth Court's order finding that the Philadelphia Planning Commission erroneously permitted Appellants to make changes to an approved development plan (a "Master Plan") for a planned residential development. We affirm the order of the Commonwealth Court, albeit for different reasons.

In 1971, the Philadelphia City Council added Section 14–226 to the Philadelphia Zoning Code, which established a RC–6 Residential District classification. Section 14–226 describes a RC–6 Residential District as follows:

This district is intended to encourage multiple use development on large tracts of land in accordance with a plan of development approved by and filed with the City Planning Commission. Said plan shall be in conformity with stated standards as to type and use, area requirements, off-street parking and loading, and signs.

It is the intent of this district to permit development of ground with the view toward preservation, to the extent possible, of existing topography, trees, natural waterways, and other natural amenities unique to the property.

It is intended that each development be undertaken with the knowledge that no zoning or building permit may be ob-

tained which is not in accord with the approved development plan.

Phila. Zoning Code § 14–226(1). A RC–6 Residential District is created upon the Planning Commission's and City Council's approval of a development plan describing the development of the entire area that will make up the proposed District. *See* Phila. Zoning Code § 14–226(2)(a). Once a development plan is approved it becomes the Master Plan for the newly created RC–6 Residential District. A developer may then obtain a zoning and use registration permit from the Philadelphia Department of Licenses & Inspections ("L & I") to develop the District in a manner that is consistent with the Master Plan.

Section 14–226 does not include a sunset provision, i.e., a provision that would terminate a Master Plan if the RC–6 Residential District is not entirely developed after a specified number of years.[1] A Master Plan can therefore stay in effect forever. However, Section 14–226 does provide that a Master Plan may be amended as follows:

At any time after final adoption, the owner of the property or his authorized agent, may apply to the City Planning Commission for changes in the approved development plan; provided, that at the time said change is requested, that an amended plan is submitted to the City Planning Commission and the City Council. The City Planning Commission shall submit in writing to the Council its recommendations regarding the amendments. Within 45 days of its receiving the written recommendation from the Commission, the Council shall reply in writing informing the Commission as to the action the Council has taken in approving, disapproving, amending or deferring the change. If the Council does not reply in writing to the Commission within the aforementioned 45 day period, Council's approval will be presumed. And further provided, that no change shall be approved by the City Planning Commission which is contrary to the

[1]. Generally, zoning permits expire after a year if construction has not begun. *See* Phila. Zoning Code § 14–1703(4).

criteria set forth in this Chapter, or which permits a use not provided in this Chapter.

Phila. Zoning Code § 14–226(2)(b).[2] Accordingly, where a person wants to develop land in a RC–Residential District, and in doing so, make changes to the Master Plan, that person must file both a request to change the Master Plan and an amended development plan with the Planning Commission and City Council. After the Planning Commission formally reviews the amended plan and recommends to City Council either that the amended plan be approved or disapproved, City Council makes a final decision. If the amended plan is approved by City Council, or deemed approved by virtue of City Council's inaction, it essentially supercedes the old Master Plan and becomes the Master Plan for the area at issue in the RC–6 Residential District.

Subsequent to the adoption of Section 14–226 and the creation of several RC–6 Residential Districts, the Planning Commission adopted an administrative policy of internally approving minor changes to a Master Plan without submitting the changes to formal review by the Planning Commission or City Council ("Minor Modification Policy").[3] Under the Minor Modification Policy, upon receiving a developer's request for changes to a Master Plan and an amended plan, the Planning Commission staff initially reviews the changes to determine if they are minor modifications of the Master Plan. N.T., 12/17/97, at 20–22. This decision is based on the following criteria:

a) The changes proposed result in less Gross Floor Area (G.F.A.) or do not increase the amount by more than 1% of the total G.F.A. permitted by the Master Plan;

b) The changes proposed result in less Building Coverage or do not increase the amount by more than 1% of the total Building Coverage permitted by the Master Plan;

**2.** Pursuant to amendments to the Zoning Code by the City of Philadelphia following the Commonwealth Court's order in the instant case, the provisions in Section 14–226(2)(b) now appear in Section 14–226(2)(c) of the Zoning Code.

**3.** There is no evidence in the record that City Council endorsed or saw the Policy before it was adopted.

c) The changes proposed result in less Impervious Coverage [4] or do not increase the amount by more than 1% of the total Impervious Coverage permitted by the Master Plan;

d) The changes proposed result in less dwelling Units [as allowed under the Master Plan], or if the number of dwelling Units are proposed to increase, they do so in accordance with the above paragraphs; and

e) If buildings or access roads are proposed to be relocated, the relocation must result in equal or less environmental impact than the impact of the original location, the relocation must comply with paragraphs a through c above, and the resultant relocation shall not move any buildings or roads closer to the district boundary than permitted by the Master Plan.

Criteria for Staff Approval of Master Plan Modifications, R.R. at 63a.[5] If the staff finds that the proposed changes constitute minor modifications, the Planning Commission approves the developer's request to make such modifications to the Master Plan. The Planning Commission then notifies L & I that the modifications to the Master Plan have been approved and that the developer can obtain a zoning permit to build according to the modifications. N.T., 12/17/97, at 21–22.[6] On the other hand, if the staff concludes that the proposed changes do not qualify as minor modifications, the Planning Commission notifies the developer that the changes and the amended plan must be formally approved in accordance with the procedures outlined in Section 14–226(2)(b). N.T., 2/8/99, at 128–29, 131–32.

In 1972, the Planning Commission and City Council approved a Master Plan creating a RC–6 Residential District of thirty-six acres in Roxborough, a community in northwest

4. Impervious coverage means the amount of pavement to be used at the development. N.T., 12/17/97, at 40.

5. Although the Minor Modification Policy was developed in the early 1970s, it was not reduced to writing until 1986. *Id.*

6. Members of the Planning Commission testified that they would also notify City Council of any minor modifications it approved to a Master Plan. N.T., 12/17/97, at 21–22.

Philadelphia. The eastern half of the District was subsequently developed into "Green Tree Run" and "Green Tree Summit" condominiums pursuant to the 1972 Master Plan. In 1985, a company called Balcorp Corporation wanted to develop the western half of the District, known as "Hunters Pointe," and make changes to the 1972 Master Plan. N.T., 9/23/98, at 14. Accordingly, Balcorp submitted to the Planning Commission both a proposal for changes to the 1972 Master Plan and an amended plan for the area encompassing Hunters Pointe. Applying its Minor Modification Policy, the Planning Commission reviewed the changes and determined that they did not qualify as minor modifications. Consequently, the Planning Commission formally reviewed the changes and the amended plan, decided that the plan should be approved, and then forwarded its recommendation of approval to City Council. In February 1986, City Council approved the plan, and thus, the 1985 plan submitted by Balcorp became the new Master Plan for Hunters Pointe. The 1985 Master Plan provides for the development of ten buildings to be used as condominiums, 202 dwelling units, 347 parking spaces, a gross floor area of 239,774 square feet, and an impervious coverage of 284,080 feet.

Two years later, Balcorp submitted a request for changes to the 1985 Master Plan and an amended plan to the Planning Commission. After initially reviewing the proposed changes, the Planning Commission's staff concluded that the changes were minor modifications to the 1985 Master Plan and notified L & I that the modifications to the Master Plan had been approved.[7] L & I subsequently issued a zoning permit to Balcorp authorizing it to develop Hunters Pointe in a manner consistent with the minor modifications to the 1985 Master Plan.[8]

Balcorp, however, never developed Hunters Pointe and sometime after 1988, a new unidentified owner acquired the

7. The record is unclear whether the Planning Commission ever notified City·Council that it approved these changes as minor modifications.

8. The minor modifications to the 1985 Master Plan approved by the Planning Commission in 1988 are not described in the record.

property. The new owner planned to develop the property but wanted to deviate from what was permitted under the 1985 Master Plan. Thus, in 1995, a request for changes to the 1985 Master Plan and an amended plan was submitted to the Planning Commission on behalf of the new owner by the Cheshire Group, Inc., a development company of which Appellant Kravitz was president. Following its review of the requested changes, the Planning Commission determined that the changes did not amount to minor modifications, because they proposed to relocate buildings closer to the property line, which would negatively impact the environment. N.T., 12/17/97, at 32. Accordingly, the Planning Commission formally reviewed the proposed changes and the amended plan. The Planning Commission decided that the amended plan should be approved and provided City Council with its recommendation of approval. However, following a public hearing, at which members of the community surrounding Hunters Pointe and Councilman Michael Nutter, the City Council Representative for the Hunters Pointe community, expressed their opposition, City Council voted to disapprove the amended plan.

In 1996, another request to change the 1985 Master Plan and an amended plan was submitted to the Planning Commission but this time from Appellant Shawmont Development. Specifically, Shawmont Development sought to make the following changes to the 1985 Master Plan: reduce the number of buildings to be developed from ten to six; change the use of the buildings from condominiums to apartments; add an in-ground swimming pool, guardhouse, and clubhouse; increase the number of dwelling units from 202 to 204; make 61 more parking spots; reduce the total impervious coverage from 284,080 feet to 211,233 feet; and increase the gross floor area by approximately 0.78%. Although the changes were substantially similar to the changes sought a year earlier by Cheshire Group, N.T., 9/23/99, at 59–60, the Planning Commission determined that the changes proposed by Shawmont Development qualified as minor modifications to the 1985 Master

Plan.[9] The Planning Commission approved the modifications to the 1985 Master Plan and notified L & I that the modifications were acceptable.[10] Shawmont Development subsequently applied to L & I for a zoning permit to develop Hunters Pointe according to the 1985 Master Plan with the modifications approved by the Planning Commission, which L & I granted on December 23, 1996.[11]

In August 1997, Shawmont Development commenced development of Hunters Pointe. Upon observing the construction and learning that L & I had granted Shawmont Development a zoning permit to develop Hunters Pointe in a manner that deviated from the 1985 Master Plan, Appellees, representatives of civic associations in areas neighboring Hunters Pointe,[12] timely appealed the issuance of the zoning permit to the Zoning Board of Adjustment.[13] Appellees argued that L

9. The Planning Commission found that Shawmont Development's proposed changes would not place the buildings any closer to the property's boundary lines than that allowed for under the 1985 Master Plan and therefore, the changes would not cause a greater negative impact on the environment. N.T., 12/17/97, at 40, 43.

10. Members of the Planning Commission testified that they notified City Council by forwarding a copy of the letter it sent to Shawmont Development approving the plan to Councilman Nutter's office and calling Councilman Nutter's office to inform him that the modifications had been approved. N.T., 12/17/97, at 21–22, 27. However, there is no finding by the trial court that such notice was given to Councilman Nutter. Additionally, at the zoning board adjustment hearing, Councilman Nutter testified that he never received a copy of the letter notifying Shawmont Development that the plan was approved. N.T., 12/17/96, at 64. Councilman Nutter also testified that he could not confirm whether someone from the Planning Commission had called his office. *Id.*

11. On December 22, 1996, Hunters Pointe Associates, L.P. acquired Hunters Pointe. Kravitz and Shawmont Development are the principals of Hunters Pointe Associates.

12. Appellee Elizabeth Bailey is president of the Derling Park Civic Association, Appellee Sandy Wynn is president of The Green Tree Run Community Association, Appellee Joseph Walker is president of the Shawmont Valley Association, and Appellee Richard Metz is president of the Roxborough Green Space Project.

13. After noticing the development at Hunters Pointe in August 1997, Appellees contacted Councilman Nutter to find out whether a zoning permit had been granted. On September 12, 1997, Councilman Nutter's office learned that L & I had granted Shawmont Development a zoning permit and subsequently notified Appellees of that fact.

& I had erroneously issued the zoning permit because neither the Planning Commission nor City Council had formally approved the modifications to the 1985 Master Plan. In April 1998, following several public hearings, the Zoning Board dismissed the appeal, concluding that it lacked jurisdiction to review the Planning Commission's decision that had authorized L & I to issue a zoning permit to Shawmont Development.[14]

Appellees appealed from the order of the Zoning Board to the trial court. The trial court affirmed the Zoning Board's decision that the Board lacked jurisdiction and determined that it was the appropriate forum for an appeal from the Planning Commission's decision authorizing a zoning permit for a RC–6 District. Accordingly, the trial court reviewed the Planning Commission's Minor Modification Policy and concluded that it was valid as a reasonable interpretation of Section 14–226 by an expert agency responsible for administering the ordinance.[15] Next, the trial court found that the changes

14. In making this determination, the Zoning Board noted that because Section 14–226 makes the Planning Commission and City Council solely responsible for deciding matters regarding a Master Plan for a RC–6 District, L & I performs a purely ministerial act in issuing a zoning permit based upon a Master Plan. *See Lindy Homes, Inc. v. Sabatini*, 499 Pa. 478, 453 A.2d 972 (1982) (where legislative body provides for right to building permit, "the issuance thereof by the proper official is no more than the performance of a ministerial act which admits of no discretion in the municipal officer"). Thus, the Zoning Board found that because L & I did not exercise its discretion in issuing the zoning permit, it did not have jurisdiction to review whether the zoning permit was properly issued. *See* Phila. Zoning Code § 14–1801 (zoning board may decide appeals where error is alleged in any department order, requirement, decision or determination).

15. In concluding that the Planning Commission's Minor Modification Policy was reasonable, the trial court adopted the reasoning of Stephanie L. Franklin Suber, the former City Solicitor for Philadelphia, in her September 26, 1997 letter to Councilman Nutter. In late August or early September 1997, Councilman Nutter sought an opinion from Ms. Franklin Suber about whether the Planning Commission's Minor Modification Policy was proper under Section 14–226. After reviewing the facts and applicable law, Ms. Franklin Suber made the following conclusion:

I believe the "minor modification" policy is defensible. At the least, I am persuaded that it would be inappropriate for the City Solicitor, by opinion, to overturn a well-settled, reasonable, and previously-un-

requested by Shawmont Development qualified as minor modifications under the five criteria set forth by the Planning Commission, and thus, entered an order upholding the issuance of the zoning permit.

On appeal, the Commonwealth Court reversed, finding that the Planning Commission lacked the authority to implement the Minor Modification Policy because there was no language in Section 14–226 giving the Planning Commission the authority to short-circuit the ordinance's procedure for making changes to a Master Plan, even if those changes were minor. Therefore, the Commonwealth Court held that the Planning Commission erroneously approved the changes submitted by Shawmont Development pursuant to the Minor Modification Policy and improperly authorized L & I to issue a zoning permit to Shawmont Development. We subsequently granted allocatur to determine first, whether the Commonwealth Court properly concluded that Section 14–226 does not provide the Planning Commission with the authority to independently approve minor changes to a Master Plan, and second, if Section 14–226 provides the Planning Commission with the authority to independently approve changes, whether the Commonwealth Court failed to give appropriate deference to the Planning Commission's Minor Modification Policy.

An agency's authority to adopt rules and regulations regarding an ordinance concerns a matter of law, and therefore our standard of review is plenary. *See Phillips v. A–Best Products Co.,* 542 Pa. 124, 665 A.2d 1167, 1170 (1995). An agency clearly has the authority to adopt rules with respect to

challenged policy established and enforced by the administrative body with expertise in interpreting the ordinance provisions in question. I believe if such policy is to be overturned, City Council is the appropriate body to do so by amending § 14–226.

Letter from Stephanie L. Franklin–Suber to Michael Nutter (Sept. 26, 1997), R.R. at 54a. Accordingly, in finding that the Minor Modification Policy was reasonable, Ms. Franklin Suber, and in turn the trial court, relied heavily on the fact that the Planning Commission had applied the Policy for years and that City Council had never questioned it. However, because the record fails to establish whether the Planning Commission ever actually notified City Council of the Minor Modification Policy prior to the instant dispute, we cannot find that City Council's failure to legislatively overrule the Policy evinces its approval.

the administration of a statute where the statute specifically empowers the agency to do so. *Borough of Pottstown v. Pennsylvania Mun. Ret. Bd.*, 551 Pa. 605, 712 A.2d 741, 743 (1998); *Pennsylvania Human Relations Comm'n v. Uniontown Area Sch. Dist.*, 455 Pa. 52, 313 A.2d 156, 168–69 (1973).[16] Nevertheless, even where a statute does not explicitly provide an agency with rule-making powers, if the agency is directed to operate under the statute, the agency may also create rules concerning its administration of the statute based on its interpretation of the statute. *Borough of Pottstown*, 712 A.2d at 743; *Uniontown Area Sch.*, 313 A.2d at 168–69; *see also Pennsylvania Assoc. of Life Underwriters v. Commonwealth Dep't of Ins.*, 29 Pa.Cmwlth. 459, 371 A.2d 564, 565 (1977) (interpretative rules commonly arise as a result of the tasks assigned to the agency). Where an administrative agency is specifically authorized to adopt rules under a statute, the rules adopted by an agency are binding upon a reviewing court as part of the statute as long as they are "(a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable." *Uniontown Area Sch.*, 313 A.2d at 169. On the other hand, where a rule is pronounced by an agency pursuant to its interpretative powers, a court shall only defer to the rule if it is reasonable and "genuinely tracks the meaning of the underlying statute." *Borough of Pottstown*, 712 A.2d at 743.

■ Here, no provisions in Section 14–226 specifically direct the Planning Commission to establish rules regarding the administration of the ordinance. Nonetheless, Section 14–226 delegates substantial administrative responsibility to the Planning Commission. As noted above, the ordinance requires the Planning Commission, along with City Council, to review and approve a development plan as a Master Plan for a RC–6 Residential District. Phila. Zoning Code § 14–226(1). Once a Master Plan is approved, the Planning Commission is also responsible for reviewing development plans to make sure that they comply with the Master Plan. *See* Phila. Zoning Code

16. We find that the rules governing an agency's power to administer a statute are equally appropriate when considering an agency's power to administer a municipal ordinance.

§ 14–226(1) (RC–6 Districts are intended to allow multi-use development based on a development plan "approved by and filed with the City Planning Commission.").[17]

▉ With regard to changing a Master Plan, developers must submit requests for changes to the Planning Commission and the Planning Commission is in charge of initially reviewing those changes. Phila. Zoning Code § 14–226(2)(b). Although the Planning Commission must then make recommendations of approval or disapproval of the changes to City Council, City Council relies heavily on the Planning Commission's expert analysis and if City Council fails to act within forty-five days of receiving the Planning Commission's recommendation approving the changes, the Planning Commission's recommendation stands as the final decision. *See id.;* Phila. City Code and Home Rule Charter § 4–604 annotation 1. Based on these substantial tasks assigned to the Planning Commission under Section 14–226, we conclude that the Planning Commission has the authority to adopt rules based on its interpretation of the ordinance in order to further its administration of the ordinance. *See Borough of Pottstown,* 712 A.2d at 743; *Uniontown Area Sch.,* 313 A.2d at 168–69. Moreover, given that the Planning Commission is responsible for reviewing development plans to ensure that they comply with the Master Plan, as well as for initially reviewing submissions for changes to a Master Plan, we find, contrary to the Commonwealth Court, that the Planning Commission was sufficiently empowered to implement a minor modification policy to administer the review process.

17. The recent amendments to the Zoning Code also address the Planning Commission's responsibility to review development plans to determine whether they coincide with the Master Plan. Section 14–226(2)(b) of the Zoning Code now states:

Determination of Compliance with the Approved Development Plan. The Planning Commission in reviewing plans submitted by the owner of the property or their authorized agent for issuance of zoning permits shall determine that all of the following applicable conditions have been complied with. If the submission fails to meet any of the applicable conditions, it shall not be found to be in accordance with the approved master plan.

Phila. Zoning Code § 14–226(2)(b).

■ Notwithstanding our conclusion that the Planning Commission had the power to adopt a minor modification policy to administer Section 14–226, an administrative agency's interpretative rule, as noted above, cannot be valid unless it is reasonable and genuinely tracks the meaning of the law being interpreted. *See Borough of Pottstown,* 712 A.2d at 743. Thus, we must determine whether the Minor Modification Policy adopted by the Planning Commission is a reasonable interpretation of Section 14–226 and therefore should have been accorded deference by the Commonwealth Court. Appellants argue that the Minor Modification Policy is reasonable and consistent with Section 14–226's intent because only *de minimis*[18] changes, which would have initially been approved as part of the Master Plan, may be approved under the Policy. Appellees contend, however, that the Minor Modification Policy is not reasonable, because it allows the Planning Commission staff to approve clearly significant changes as minor modifications without formal review by the Planning Commission and City Council, which is not what City Council intended. We agree with Appellees.

■ Like statutes, the primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance. *See* 1 Pa.C.S. § 1921.[19] Where the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit. *See id.;* 1 Pa.C.S. § 1903 (words and phrases in a statute shall be construed in accordance with their common and accepted usage). Alternatively, when the words in an ordinance are not explicit, the legislative body's intent may be ascertained by considering, among other things, the ordinance's goal, the consequences of a particular interpretation of the ordinance, and interpretations of the ordinance by an administrative agency. *See* 1 Pa.C.S. § 1921.

18. *De minimis* is an adjective meaning trifling or minimal. Black's Law Dictionary (7th ed.1999). ˙

19. When interpreting the meaning of municipal ordinances, we are guided by the principles of statutory construction. *Borough of Fleetwood v. Zoning Hearing Bd.,* 538 Pa. 536, 649 A.2d 651, 656 (1994).

Furthermore, in determining the proper interpretation of an ordinance, courts and agencies shall also presume that the legislative body "[did] not intend a result that is absurd, impossible of execution or unreasonable." *See* 1 Pa.C.S. § 1922; *County of Allegheny v. Moon Township Municipal Auth.*, 543 Pa. 326, 671 A.2d 662, 666 (1996).

Here, Section 14–226(2) states that a developer in a RC–6 District may apply for "changes" in a Master Plan by submitting an amended plan to the Planning Commission and to City Council. Phila. Zoning Code § 14–226(2). The provision then sets forth a procedure for determining whether such changes shall be allowed as amendments to a Master Plan, and that procedure, as discussed previously, calls for a formal review of the changes by both the Planning Commission and City Council (the "Amendment Procedure"). *Id.* Although neither Section 14–226 nor the Philadelphia Zoning Code define the word "change," the Planning Commission interpreted "change" as only applying to changes that appreciably alter the Master Plan. As a result of its interpretation, the Planning Commission adopted the Minor Modification Policy as a means of internally approving *de minimis* changes that unexpectedly arose as development progressed pursuant to a plan that was consistent with the Master Plan. As Martin Soffer, the Environmental Review Officer for the Planning Commission, explained:

> One [of the reasons for the Minor Modification Policy] is the experience we have with development is we do not get as built plans. Sometimes plans come in with walls showing a certain thickness and, in reality, *the thickness of the walls could be one foot so the actual buildings could be slightly, when I say slightly off, due to the engineering and conditions, slightly off from what's on the plan but usually within a few feet.*
>
> . . .
>
> . . . Sometimes you have problems where the footings of a structure need to go in. *You may shift the building slightly in terms of what's there in terms of putting in supports, connections into infrastructure, things like that and some-*

*times we experience that we have to shift slightly to get Sanitary to work in their ground,* the ground doesn't perk, and you wind up shifting so a particular house can be built to allow Sanitary or stormwater management within the same lot and taking it to the ground.

N.T., 2/8/99, at 96–97 (emphasis added). Rick Lombardo, Chief Project Manager for the Planning Commission, further described the Minor Modification Policy as follows:

The modification process is a process by which we look at a submission and compare it to the plan of record and determine whether or not there's any change or not. *I'm referring to the word modification, basically the finding was or there was not a change from the approved plan to warrant sending everything back to City Council and the Planning Commission.* That everything that was proposed and the newly submitted plan were equal to or less than the plan of record.

N.T., 12/17/97, at 20–21 (emphasis added).

 Depending on its context, the word "change" has a wide range of possible meanings, extending from very small and unnoticeable deviations to complete transformations of original objects. Therefore, we cannot say that the plain use of the word change in Section 14–226 is so clear and unambiguous that it is not open to interpretation. *See Baker v. Retirement Bd. of Allegheny County,* 374 Pa. 165, 97 A.2d 231, 234 (1953); *see also Envtl. Def. Fund, Inc. v. Envtl. Prot. Agency,* 82 F.3d 451, 464 (D.C.Cir.1996) (Congress' use of word "support," which has large scope of possible meanings, was not completely clear and was therefore subject to interpretation). In determining whether City Council intended the word "change" to include all changes, no matter how minute, or only those changes that notably differ from the Master Plan, we find it instructive to look at the goals of the ordinance and the consequences of various interpretations of the ordinance. *See* 1 Pa.C.S. § 1921. The clear purpose behind the creation of a RC 6 Residential district is to encourage planned residential developments on large tracts of open space. *See* Phila. Zoning Code § 14–226(a). Given this

purpose, it seems unlikely that City Council intended such a strict interpretation of the word "change" so that *de minimis* changes which fail to appreciably divert from a Master Plan, such as the removal of a parking space or the addition of hedges to the side of a building, would have to be presented and formally approved before the Planning Commission and City Council. Clearly, if all *de minimis* changes had to be approved according to the Amendment Procedure, development would constantly be stalled, which would ultimately discourage developers from building in RC–6 Residential Districts and defeat the very purpose for such Districts. Thus, as even Appellees agree, we may assume that City Council did not intend such an absolutist reading of Section 14–226. *See* Appellees' Brief at 11; *see also* 1 Pa.C.S. §§ 1921–22; *Moon Township Mun. Auth.*, 671 A.2d at 666.[20,21]

**20.** *De minimis non curat lex* is a common legal principle meaning that the law does not care for small or trifling matters. Black's Law Dictionary 431 (7th ed.1999). Pursuant to this principle, courts disregard trivial matters that serve merely to exhaust the court's time. *District of Columbia v. Orleans*, 406 F.2d 957, 959 (D.C.Cir.1968). We agree with the sentiments of the United States Court of Appeals for the District of Columbia that this principle may also be soundly applied when determining the intent of government entities with regard to the role of administrative agencies responsible for regulatory programs. *See Alabama Power Co. v. Costle*, 636 F.2d 323, 360 (D.C.Cir.1979). Thus, we are reluctant to interpret Section 14–226 in such a way that would "mandate pointless expenditures of effort" by City Council. *See id.*

**21.** This interpretation is consistent with traditional zoning laws. Under traditional zoning laws, a party seeking a change from a zoning ordinance ("a variance") has to meet a heavy three-prong burden. *See Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 501 Pa. 550, 462 A.2d 637, 640 (1983). It is well-established, however, that a developer who seeks a *de minimis* change from a zoning ordinance does not have to meet the heavy burden for obtaining a variance. *Stewart v. Zoning Hearing Bd. of Radnor Township*, 110 Pa.Cmwlth. 111, 531 A.2d 1180, 1182 (1987). This *de minimis* exception "applies where only a minor deviation from the zoning ordinance is sought and rigid compliance is not necessary to protect the public policy concerns inherent in the ordinance." *Constantino v. Zoning Hearing Bd. of Borough of Forest Hills*, 152 Pa.Cmwlth. 258, 618 A.2d 1193, 1196 (1992). There are no set criteria for a *de minimis* variance. Rather, *de minimis* variances are granted according to the particular circumstances of each case. *See Stewart*, 531 A.2d at 1182 (*de minimis* variance exception proper where landowner wanted to vary site a few feet short of one acre requirement); *Pyzdrowski v. Bd. of Adjustment of City of Pittsburgh*, 437

■ Although we find that the Planning Commission was not compelled to strictly interpret the word "change" in Section 14–226(2)(a) so as to include *de minimis* type changes, we also find that an overly broad interpretation of the word would be inconsistent with City Council's intent. In deciding whether or not to approve a development plan as a Master Plan and establish a RC–6 Residential District, both the Planning Commission and City Council undoubtedly attempt to protect the interests of the surrounding community. Indeed, both the Planning Commission and City Council review development plans at hearings open to the public not only to provide the community with notice of possible development in the area but also to garner community input regarding the plan.[22] *See, e.g., Schultz v. City of Philadelphia,* 385 Pa. 79, 122 A.2d 279, 281 (1956) ("[t]he object of a public hearing is to enable the legislative body to ascertain preliminarily the views of the members of the public in regard to the proposed legislation"). Moreover, by requiring City Council's approval of development plans, the ordinance ensures that the interests of citizens affected by the development are represented in the approval process. In light of the consideration given to the community in the approval process, we find that City Council must have intended the word "change" in Section 14–226(2)(a) to apply to any changes that would have more than a *de minimis* effect on the community, so that the changes are reviewed in a forum where the interests of the community to be affected are represented and given adequate consideration.[23]

Pa. 481, 263 A.2d 426, 431–32 (1970) (zoning board properly granted a *de minimis* variance to allow increase of approximately 4% of the width in a one-acre lot); *Swemley v. Zoning Hearing Bd. of Windsor Township,* 698 A.2d 160, 163 (Pa.Commw.1997) (34% deviation from setback requirement was not *de minimis* despite fact that neighbor was granted variance for similar deviation).

22. As this Court noted in *Cheney v. Village 2 at New Hope, Inc.,* 429 Pa. 626, 241 A.2d 81 (1968), "[o]ne of the most attractive features of Planned Unit Development is ... the chance for the builder and the municipality to sit down and tailor the needs of the community and the requirements of the land on which it is to be built." *Id.* at 87.

23. According to the Pennsylvania Municipal Planning Code, because the public has an interest in the preservation and integrity of an

 Here, Appellants and the Planning Commission claim that the Minor Modification Policy only allows *de minimis* changes to a Master Plan to be approved internally by the Planning Commission. However, in reviewing the five criteria that qualify a change as a minor modification under the Policy, especially in light of their application to the instant case, we cannot conclude that those criteria succeed in identifying only those types of changes that City Council intended to exclude from the Amendment Procedure. As demonstrated in the instant case, proposed changes may qualify as minor modifications under the five criteria established by the Planning Commission even though they increase or decrease the number of structures, transform the types of structures to be built, i.e., from a building to a swimming pool, alter the uses for the structures, or completely relocate buildings and access roads. We fail to see how these types of changes can be considered *de minimis* changes to a Master Plan. Furthermore, permitting such clearly significant changes to be approved under the Minor Modification Policy provides a means for an end-run around the Amendment Procedure and renders City Council's review and approval meaningless. In light of these consequences, we simply cannot uphold the Planning Commission's Minor Modification Policy as a reasonable interpretative policy that is consistent with the meaning of Section 14–226.

 Accordingly, we hold that the Planning Commission improperly approved the changes submitted by Appellants pursuant to its Minor Modification Policy and therefore, erroneously authorized L & I to issue a zoning and use registration permit to Appellants allowing them to develop Hunters Pointe in accordance with the approved changes. Thus, we affirm the order of the Commonwealth Court which reversed

approved development plan, a governing body or planning agency must hold a public hearing prior to approving any changes. *See* 53 P.S. § 10706. Although the Municipal Planning Code does not apply to Philadelphia, we find that in Section 14–226, City Council has sought to provide similar protection to the residents in the area to be affected by the changes.

the trial court's order upholding the Planning Commission's approval of the changes submitted by Appellants.[24]

Chief Justice ZAPPALA files a dissenting opinion in which Justice CASTILLE and Justice NEWMAN join.

Chief Justice ZAPPALA, dissenting.

I agree with the majority's conclusion that "the Planning Commission has the authority to adopt rules based on its interpretation of [Philadelphia's Zoning Code § 14–226] in order to further its administration of the ordinance." Majority Opinion at 502. Further, I agree with the majority that the word "change" set forth in Section 14–226(2)(b) of the Code is not so clear and unambiguous as to not be subject to further interpretation. I disagree, however, with the majority's implicit conclusion that this Court's interpretation of the term "change" set forth in Section 14–226(2)(b) is more favorable than that established by the Planning Commission in implementing the Minor Modification Policy, a plan which was established by the Commission more than thirty years ago. Accordingly, I dissent.

As noted, the majority does not conclude that the Planning Commission lacked the authority to adopt a policy, such as the Minor Modification Policy, where such policy is reasonable and tracks the meaning of the law being interpreted. Specifically, in discussing whether Section 14–226(2)(b) absolutely precludes a policy of this nature, the majority concedes that given the purpose of the provision, i.e., to encourage planned residential developments on large tracts of open space,

it seems unlikely that City Council intended such a strict interpretation of the word "change" so that *de minimis* changes which fail to appreciably divert from a Master Plan, such as the removal of a parking space or the addition of hedges to the side of a building, would have to be presented and formally approved before the Planning Commission and City Council Clearly, if all *de minimis* changes had to be

**24.** *See Commonwealth v. Romero,* 555 Pa. 4, 722 A.2d 1014, 1016 (1999) (this Court may affirm decision of lower court if result is correct on any ground without regard to grounds which lower court itself relied upon).

approved according to the Amendment Procedure, development would constantly be stalled, which would ultimately discourage developers from building in RC–6 Residential Districts and defeat the very purpose for such Districts. Thus, as even Appellees agree, we may assume that City Council did not intend such an absolutist reading of Section 14–226.

*Id.* at 504. So while it appears that the majority would approve of a policy that implemented its notion of *de minimis,* here, the majority concludes that the specific policy implemented by the Planning Commission some thirty years ago goes beyond what it considers to be legitimately *de minimis.*

In my view, this Court's interpretation of the word "change" for purposes of Section 14–226(2)(b), is no more reasonable than that given by the Planning Commission by way of the Minor Modification Policy. As noted, the City has operated pursuant to the policy for the last thirty years and, in my view, if Council was not satisfied with this policy, it could have, at anytime, legislatively overruled the policy by simply amending the Code to eliminate the practice.[1] Additionally, the majority's approach legitimizes legal challenges based upon whether a particular change constitutes a *de minimis* change, as determined by this Court, and, thus, requires judicial intervention on a case by case basis.

1. The majority notes, in footnote 14, the following in this regard:
 because the record fails to establish whether the Planning Commission ever actually notified City Council of the Minor Modification Policy prior to the instant dispute, we cannot find that City Council's failure to legislatively overrule the Policy evinces its approval.
 Majority Opinion at 499 n. 14.
 Contrary to the majority, I do not find the Commission's failure to have specifically notified City Council of this policy as relevant in determining whether Council was aware of the policy. The evidence of record indicates that the policy was adopted in 1971, that the Commission has utilized the policy since then, and that the criteria implemented by the Planning Commission to determine what constitutes a minor modification was reduced to writing in 1986. Given this background, I fail to see to how City Council could have been unaware of the policy for such an extended period of time. Moreover, there is nothing in the record indicating that the City was unaware of the policy over the past quarter century.

Based on the foregoing, I would conclude that our intervention in this matter is unwarranted, unnecessary and, in my view, a waste of judicial resources. Accordingly, I would reverse the Commonwealth Court's decision.

Justice CASTILLE and Justice NEWMAN join this dissenting opinion.